801 So.2d 78 (2001)
Leo Edward PERRY, Jr., Appellant,
v.
STATE of Florida, Appellee.
No. SC96499.
Supreme Court of Florida.
October 18, 2001.
*81 Nancy A. Daniels, Public Defender, and W.C. McLain, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Barbara J. Yates, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Leo Edward Perry, Jr. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we uphold the conviction but vacate the death penalty and remand for new sentencing proceedings.
The record reflects the following facts. The victim in this case, John Johnston, age seventy-five, checked into a Pensacola motel on the evening of February 20, 1997, at around 8 p.m. The following day the staff of the motel found Johnston dead on the bed in the room he rented the previous evening. An autopsy revealed eight stab wounds to Johnston's body, i.e., four to the chest, three to the neck, and a defensive wound to Johnston's thumb.
Perry's fingerprint was on a soap wrapper found in the room, and his DNA was found in the blood stain on a towel and saliva on a cigarette butt found in the room. The victim's DNA was found on blood stains found on a light switch plate from the motel bathroom. A woman staying in the motel room next to the victim's testified that she heard noises from his room around 4 a.m. and saw a man resembling *82 Perry drive off in the victim's truck. The Florida Highway Patrol later found the victim's truck in Palm Beach County. The driver of the truck said that he obtained the truck from Perry at a service station in Lake Worth, who sought drugs in return for "renting" the truck. Perry's fingerprints were discovered on a plastic bag found in the truck.
The grand jury returned an indictment charging Perry with the February 21, 1997, first-degree murder of Johnston. The indictment alleged both premeditated murder and felony murder with robbery as the underlying felony. The jury returned a specific verdict finding Perry guilty of first-degree murder under both premeditated and felony murder theories. Following a penalty phase proceeding, the jury recommended a death sentence by a vote of ten to two. The trial court followed the jury's recommendation and imposed a death sentence, finding three aggravating circumstances: (1) the murder was committed during commission of a robbery or for pecuniary gain; (2) the murder was especially heinous, atrocious and cruel; and (3) the murder was committed in a cold, calculated, and premeditated manner. Regarding mitigation, the court gave no weight to the three offered statutory mitigating circumstances and little weight to sixteen nonstatutory mitigating circumstances. Perry raises eight issues on appeal.[1]

GUILT PHASE
First, Perry argues the trial court erred in not allowing defense counsel to question prospective jurors regarding whether they understood that a life sentence option for first-degree murder actually means life without parole.[2] To support his position, Perry argues that in Pope v. State, 84 Fla. 428, 94 So. 865, 869 (1922), this Court held:
The examination of jurors on the voir dire in criminal trials ... should be so varied and elaborated as the circumstances *83 surrounding the jurors under examination in relation to the case on trial would seem to require, in order to obtain a fair and impartial jury, whose minds are free of all interest, bias, or prejudice.
In Pope, however, this Court found no error where "[T]he question was designed to ascertain if the veniremen had conscientious scruples against enforcing the law stated in the question." Id. (emphasis added). Likewise, in Lavado v. State, 492 So.2d 1322, 1323 (Fla.1986), the other case presented by Perry, this Court found error where the trial court erred in refusing to permit counsel to ask "whether the prospective jurors could fairly and impartially consider the defense of voluntary intoxication." Id. (emphasis added).
The question propounded by counsel in the instant case, i.e., "Is there anyone laboring under the misperception that life imprisonment in Florida means life imprisonment and not a term of shorter years due to parole?", does nothing to ascertain information regarding prospective jurors' willingness or ability to accept the law or fairly and impartially consider a particular defense.[3] Moreover, Perry points to no prospective or actual juror who expressed any concern about what a "life sentence without possibility of parole" meant. Instead, all of the jurors stated that they would follow the court's instructions.
Perry is not incorrect in arguing that a juror's understanding of a life without parole sentencing option can make a crucial difference in whether the juror votes for life or death. See Simmons v. South Carolina, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994) (capital defendant has right to have jury informed that life sentence option is without parole eligibility). In this case, however, the trial court properly instructed the jury regarding the life without parole sentencing option by providing the standard instruction, i.e., regarding "life imprisonment without the possibility of parole," during the penalty phase preliminary instruction, as well as two times during the standard penalty phase closing instructions.[4] Moreover, defense counsel was permitted to argue numerous times to the jury during his closing argument that life imprisonment meant without the possibility of parole.
As stated by the Court in Franqui v. State, 699 So.2d 1312, 1322 (Fla.1997), "[t]he scope of voir dire questioning rests in the sound discretion of the court and will not be interfered with unless that discretion is clearly abused." For the aforementioned reasons, we find that the trial court did not abuse its discretion in sustaining the State's objection to Perry's line of questioning regarding prospective jurors' knowledge of Florida's life imprisonment law and, therefore, find Perry's claim to be without merit.[5]
*84 Perry next contends that the trial court erred in failing to grant his motion for judgment of acquittal because the State failed to present sufficient evidence of premeditation. A motion for judgment of acquittal should be granted in a circumstantial evidence case if the State fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt. See Orme v. State, 677 So.2d 258, 261-62 (Fla.1996).[6]
[The court's] view of the evidence must be taken in the light most favorable to the state. The state is not required to "rebut conclusively every possible variation" of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events.
State v. Law, 559 So.2d 187, 189 (Fla.1989) (citations omitted). The trial court's finding denying a motion for judgment of acquittal will not be reversed on appeal if there is competent substantial evidence to support the jury's verdict. See Orme, 677 So.2d at 262.
"Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill." Green v. State, 715 So.2d 940, 943 (Fla. 1998). This purpose to kill must exist for such a time before the homicide "to permit reflection as to the nature of the act to be committed and the probable result of that act." Id. at 944. Premeditation can be shown by circumstantial evidence. See Woods v. State, 733 So.2d 980, 985 (Fla. 1999). Whether the State's evidence fails to exclude all reasonable hypotheses of innocence is a question of fact for the jury. See Cochran v. State, 547 So.2d 928, 930 (Fla.1989). As this Court has stated:
Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.
Green, 715 So.2d at 944 (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)). Moreover, whether premeditation exists is a question of fact for the jury, but the jury is not required "to believe the defendant's version of the facts when the State has produced conflicting evidence." Spencer v. State, 645 So.2d 377, 381 (Fla.1994); see also Finney v. State, 660 So.2d 674 (Fla. 1995); Cochran, 547 So.2d at 928.
Perry argues that his confession and trial testimony evidenced the killing was the unintentional product of Perry's impulsive overreaction to a perceived threat while he was under the influence of alcohol and cocaine. The "perceived threat," as explained by Perry, was the alleged sexual advance of the seventy-five year old victim made while Perry, after retiring for the evening, was lying on the floor in his sleeping *85 bag at the foot of Johnston's bed. The State argues that Perry's self-serving testimony was internally inconsistent and inconsistent with evidence presented by the State, and the State produced sufficient evidence for the jury to find that Perry committed this murder in a premeditated manner.
Indeed, Perry's version of the events leading to Johnston's murder is contradicted by the evidence presented at trial. The State presented evidence which pointed to holes in the top part of the sheet covering the victim, consistent with those made by a sharp knife. Testimony was also presented which indicated that the victim was lying face up and had the sheet tucked under his arms at the time he was stabbed. In addition, blood spatter was found on the wall and pillows at the head of the victim's bedand not near the foot of the bed where Perry was lying when supposedly threatened by Johnston. Blood spatter analysis was also consistent with the victim's head being down on his pillow at the time the wounds were inflicted.
In addition, the jury heard that after Perry was arrested in New Orleans, Perry never mentioned to police the version of events he portrayed at trial (i.e., he woke up to Johnston standing over him and masturbating). Rather, Perry told the police he attacked Johnston because of an advance that Johnston made toward Perry while he was "in the shower." Moreover, Perry told his ex-wife the incident was a result of Johnston approaching him "in the shower"; again, he made no mention of the version of events stated by him at trial.
The jury also apparently did not believe Perry's intoxication defense as Perry's own actions on the night of the murder belie his claimed inability to form the requisite intent.[7] Furthermore, and notwithstanding his own expert's testimony, the State's psychologist concluded that Perry "was able to engage in purposeful, goal-oriented, intentional behavior during the time period surrounding the homicide." Given Perry's self-serving testimony, which was internally inconsistent and inconsistent with the evidence presented by the State, and because the jury also heard that Perry was convicted five times for crimes involving dishonesty or false statements, the jury was not unjustified in rejecting Perry's version of the incident.
Although multiple stab wounds alone do not prove premeditation, the nature and location of these wounds do support the finding of premeditation. See Rogers v. State, 783 So.2d 980, 989 (Fla. 2001). As stated in Jimenez v. State, 703 So.2d 437, 440 (Fla.1997), the deliberate use of a knife to stab a victim multiple times in vital organs is evidence that can *86 support a finding of premeditation. See id. (citing Preston v. State, 444 So.2d 939, 944 (Fla.1984)); see also Kramer v. State, 619 So.2d 274, 276 (Fla.1993) (holding that blood spatter and victim injury evidence can provide a sufficient basis for the conclusion that premeditation existed).
In this case, evidence showed the wounds were to Johnston's chest and neck, both areas where an attack would produce grievous wounds. Four of the seven wounds would have, in themselves, each been fatal. Moreover, "extensive" force was required for at least one chest wound as the knife went through Johnston's chest bone, further demonstrating that the victim was carefully stabbed in a deliberate manner in order to effect death.
Other circumstances are present in this case that support a finding that the killing was the result of a preconceived plan. The State's theory was that Perry's primary motive in killing Johnston was to steal Johnston's property, especially his truck. Perry admitted he had little money and no means of transportation, while Johnston had both. The evidence showed that Perry took both Johnston's wallet and his truck, and he later "rented"the truck for money to buy drugs.
Also, as the trial judge indicated in his sentencing order, the evidence established that the knife used to kill the victim had a single-edged blade and, therefore, could not have been the double-edged "boot" knife which Perry carried on his person. It is therefore logical to assume that the defendant went about obtaining another knife to kill the victim rather than use the defendant's own knife. That there was no evidence Perry had formed a criminal intent in the days prior to the murder does not preclude the conclusion that Perry formed the necessary intent while Johnston was lying on the bed in his motel room at the time of the murder.[8]
Therefore, there is competent, substantial evidence supporting the inference of premeditation based upon the inconsistencies between the evidence presented and Perry's account of the circumstances leading to the murder, the nature of Johnston's injuries, lack of evidence of provocation or hostility between Perry and Johnston, and the existence of a plausible robbery motive. Accordingly, reasonable jurors could reject Perry's theory of non-premeditation and conclude he committed premeditated murder.
Next, Perry contends that the trial court erred in failing to grant his motion for judgment of acquittal because the State failed to present sufficient evidence of intent to commit a robbery or theft at the time of the homicide. Robbery is "the taking of money or other property which may be the subject of larceny from the person or custody of another when in the course of the taking there is the use of force, violence, assault, or putting in fear." § 812.13(1), Fla. Stat. (1997). This Court addressed the standard for establishing a robbery in Jones v. State, 652 So.2d 346, 349-50 (Fla.1995). Property that is the subject of the taking need not be in the actual physical possession or immediate presence of the person *87 who was robbed. See id. at 350. Property is taken from "the person or custody of another" if it is sufficiently under the victim's control so that the victim could have prevented the taking if she had not been subjected to the violence or intimidation by the robber. See id.
Under section 812.13(3)(b), Florida Statutes (1989),[9] the violence or intimidation may occur prior to, contemporaneously with, or subsequent to the taking of the property so long as both the act of violence or intimidation and the taking constitute a continuous series of acts or events. See Jones, 652 So.2d at 349. The taking of property after a murder, however, does not constitute robbery if the motive for the murder was not the taking of property. See Mahn v. State, 714 So.2d 391, 397 (Fla.1998) (citing Knowles v. State, 632 So.2d 62, 66 (Fla.1993), and Parker v. State, 458 So.2d 750, 754 (Fla. 1984)).
Perry claims that the taking of Johnston's keys and truck was an "afterthought" and that the same was taken merely for the purpose of leaving the scene of the homicide in the motel. Perry further claims that he found Johnston's wallet in the glove compartment of Johnston's truck, and he did not take it from the motel room. The State, however, argues that the evidence was clear that Perry was in need of money and transportation at the time of the murder, and the record is void of any motive other than robbery. Moreover, by rejecting the special jury instruction regarding "afterthought does not constitute robbery," and in specifically finding Perry guilty of armed robbery and felony murder with underlying armed robbery, the jury obviously found the State's evidence more believable than Perry's self-serving claims.
After extensively addressing the "afterthought" issue in Beasley v. State, 774 So.2d 649 (Fla.2000), this Court recently opined:
Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the murder appears from the record, the robbery conviction will be upheld. Conversely, in those cases where the record discloses that, in committing the murder, the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.
Id. at 662 (citations omitted). Indeed, the facts of the instant case distinguish it "from cases in which there is another apparent motivation for the killing, and no indication that the defendant wants or needs the valuables which are taken after the murder." Beasley, 774 So.2d at 666. In this case, Johnston picked up Perry hitchhiking in Alabama, while Perry was on his way from Chicago to South Florida. The evidence is undisputed that Perry was in need of money and transportation at the time of the murder, and he also admitted seeking drugs the night of the murder. Perry took the keys to Johnston's truck (and the truck's "starter chip") from the motel room before taking Johnston's truck and driving it from Pensacola to the West Palm Beach area. Perry also admitted that he took $60 from Johnston's wallet *88 before dumping the wallet in a trash can at a rest stop along the interstate.[10]
Further, Perry did not just "abandon" Johnston's truck after effecting a getaway. Rather, he drove the truck all the way to south Florida, his original intended destination while hitchhiking. He said he drove the truck in the West Palm Beach area for "a while" and used it for transportation, leaving the tailgate down so as to conceal the license plate whenever he drove it. Moreover, he subsequently "rented" the truck for money in order to buy drugs. Therefore, this case is unlike the cases cited by Perry, where there was "no indication that the defendant wants or needs the valuables" or there "is another apparent motivation for the killing." Id.[11]
As this Court stated in Beasley:
As in Mahn and Knowles, the evidence in Clark and Parker revealed another apparent motivation for killing the victims (Clark's desire to obtain the victim's job, and Parker's desire to keep the victim from implicating the murderers of a second victim....) Here, in contrast, there is no evidence demonstrating any motive for killing [the victim] other than to take [the victim's] money.
There is no indication, as in Mahn, of any interpersonal conflict or animosity between [the defendant] and [the victim].... There is no evidence, as in Knowles, that [the defendant] was acting "like he was completely gone" just prior to the murder.
774 So.2d at 665. Here, as in Beasley, there is no evidence demonstrating any motive for killing the victim other than to take the victim's money. See Beasley, 774 So.2d at 665; see also Jones v. State, 652 So.2d at 350 (rejecting "afterthought" argument as applied to valuables taken from victims where no other motivation for the murders appeared from the record).
*89 Furthermore, at Perry's request, the court specifically instructed the jury as follows:
If the evidence shows that the defendant took the victim's property to effect his escape, but that the taking of the victim's property was an afterthought to the use of force or violence which resulted in the death of the victim, the taking of the victim's property does not constitute robbery, but may constitute theft.
In rejecting the "afterthought" exception to robbery and in finding Perry guilty of armed robbery and felony murder with underlying armed robbery, the jury obviously found the State's evidence more believable than Perry's self-serving, and frequently inconsistent, claims.

PENALTY PHASE
Perry argues the trial court erred in permitting Perry's ex-wife to testify, while on direct examination during the penalty phase, to specific instances of Perry's violent behavior and to Perry's general statements regarding the use of a knife to kill someone, such that the evidence constituted impermissible nonstatutory aggravation. We agree.
At the very beginning of the direct examination during the penalty phase, the prosecutor asked Perry's ex-wife, Melissa Perry, if during her marriage to him, Perry was ever violent or involved in violent activity. Defense counsel objected on the ground that this subject was not an issue at trial. The court overruled the objection. At that point, the prosecutor asked Melissa to recount some specific instances of violent behavior. Melissa Perry's statements to the penalty phase jury described, in detail, a vicious beating inflicted by Perry during an incident unrelated to the crime for which he was charged.[12] In addition, Melissa Perry was permitted to testify regarding various incidents of spousal abuse by Perry.[13]
In considering the admission of evidence during the penalty phase of a trial, this Court, in Hildwin v. State, 531 So.2d 124, 127 (Fla.1988), noted:
At the outset, it must be remembered that there is a different standard for judging the admissibility and relevance of evidence in the penalty phase of a capital case, where the focus is substantially directed toward the defendant's character. See § 921.141(1), Fla. Stat. (1987) In Elledge v. State, 346 So.2d 998, 1001 (Fla.1977), we pointed out that
the purpose of considering aggravating and mitigating circumstances is to engage in a character analysis of *90 the defendant to ascertain whether the ultimate penalty is called for in his or her particular case.
Thus, evidence that would not be admissible during the guilt phase could properly be considered in the penalty phase.
Section 921.141(1), Florida Statutes (1997), relating to sentencing proceedings, provides that
evidence may be presented as to any matter that the court deems relevant to the nature of the crime and the character of the defendant and shall include matters relating to any of the aggravating or mitigating circumstances enumerated in subsections (5) and (6). Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements. However, this subsection shall not be construed to authorize the introduction of any evidence secured in violation of the Constitution of the United States or the Constitution of the State of Florida.
Id. (emphasis added). This Court has held that, to be admissible in the penalty phase, the State's direct evidence must related to any of the aggravating circumstances. See Hitchcock v. State, 673 So.2d 859, 861 (Fla. 1996) (citing Floyd v. State, 569 So.2d 1225 (Fla.1990)).
The State, however, does not claim that any of the evidence Perry challenges was relevant to an aggravating circumstance. Instead, the State argues their direct examination of Perry's ex-wife during their penalty phase presentation was admissible because defense counsel "opened the door" to it during the guilt phase of the trial because, by claiming to be nonviolent, Perry placed this trait in issue. Indeed, this Court has said that "during the penalty phase of a capital case, the state may rebut defense evidence of the defendant's nonviolent nature by means of direct evidence of specific acts of violence committed by the defendant." Hildwin v. State, 531 So.2d at 128.
The State's answer brief, however, makes this assertion without providing any references to the record. Moreover, our own review of the record reveals that the door was not opened to Perry's character for nonviolence during the guilt phase. Because the State offered this evidence through their first witness during the direct portion of the State's penalty phase case, Melissa Perry's testimony regarding Perry's prior violent acts, all unrelated to the crime at issue, constituted impermissible nonstatutory aggravation.
Moreover, the State's argument that such evidence was "anticipatory rebuttal" also fails because at the time the State introduced this evidence, the penalty phase instructions were not yet resolved, and the mitigating circumstances to be included were not finalized. This is apparent in a conference between the trial judge and counsel during a break in the defense's penalty phase case at which the prosecutor brought up instructions and asked about the mitigating circumstances to be included.[14]
*91 As this Court stated in Hitchcock v. State, 673 So.2d at 861, "the State is not permitted to present evidence of a defendant's criminal history, which constitutes inadmissible nonstatutory aggravation, under the pretense that it is being admitted for some other purpose." Id. (citing Geralds v. State, 601 So.2d 1157 (Fla.1992)). In Geralds, this Court noted:
This rule is of particular force and effect during the penalty phase of a capital murder trial where the jury is determining whether to recommend the death penalty for the criminal accused.... [Receiving inadmissible nonstatutory aggravation] has the effect of unfairly prejudicing the defendant in the eyes of the jury and creates the risk the jury will give undue weight to such information in recommending the penalty of death.
Id. at 1163. In this instance, the nature of Melissa Perry's remarks regarding Perry's "bad acts" were not in support of any aggravating circumstance, and therefore the trial court erred in admitting Melissa Perry's testimony on direct examination during the penalty phase.
Although the trial court erred, the error is subject to harmless error analysis. In criminal cases, the burden is on the State to prove beyond a reasonable doubt that the error did not contribute to the jury's recommendation of death. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla.1986). Melissa Perry's statements to the penalty phase jury were highly inflammatory and constituted impermissible nonstatutory aggravation and, as such, could have unduly influenced the penalty phase jury. As this Court has stated, "[t]he jury is charged with formulating a recommendation as to whether [the defendant] should live or die.... [O]ur turning a blind eye to the flagrant use of nonstatutory aggravation jeopardizes the very constitutionality of our death penalty statute." Kormondy v. State, 703 So.2d 454, 463 (Fla.1997). Accordingly, we cannot say there is no reasonable possibility that this error did not contribute to the jury's recommendation. See DiGuilio, 491 So.2d at 1135; see also Kormondy, 703 So.2d at 463 (admission of impermissible evidence of nonstatutory aggravation is not harmless error).
Although our remand makes it unnecessary to address the other issues Perry raises, we address one in order to aid in resentencing. Perry claims Melissa Perry's testimony concerning Perry's statement about being able to kill someone with a knife by cutting the jugular vein was not relevant to proving the cold, calculated, and premeditated (CCP) aggravating circumstance and, therefore, its admission was error.
We agree. Perry's statement was made six years before the crime, and was made before Perry even knew the victim. Therefore, given the general nature of the statement and the statement's remoteness in time to the events of the murder, we conclude that the trial court abused its discretion in admitting Perry's testimony regarding his knowledge of how to kill someone by slicing his or her jugular vein to establish the CCP aggravator *92 in this case.[15]
Accordingly, we affirm Perry's conviction but reverse the death sentence and remand for a new sentencing proceeding before a new jury.
It is so ordered.
SHAW, ANSTEAD, PARIENTE, and QUINCE, JJ., concur.
HARDING, J., concurs in result only with an opinion, in which WELLS, C.J., concurs.
LEWIS, J., concurs as to the conviction and concurs in result only as to the sentence.
HARDING, J., concurring in result only.
I agree with the majority's decision to affirm Perry's conviction and remand for a new sentencing proceeding based upon the error in permitting Perry's ex-wife to testify, while on direct examination during the penalty phase, to specific instances of Perry's violent behavior unrelated to the crime at issue. Moreover, based on the record before us, I also agree that the evidence is insufficient to establish the cold, calculated, and premeditated (CCP) aggravating circumstance. I would, however, find that Melissa Perry's testimony concerning Perry's statement about being able to kill someone with a knife by cutting the jugular vein is relevant to proving the CCP aggravating circumstance and, therefore, its admission was not error.
This Court has stated that the admission of evidence is within the trial court's discretion and will not be reversed unless a defendant demonstrates an abuse of discretion. See Medina v. State, 466 So.2d 1046 (Fla.1985); Jent v. State, 408 So.2d 1024 (Fla.1981). Moreover, this Court has recognized "the wide latitude" of the legislative evidentiary standards in capital penalty phase proceedings permitting
evidence ... as to any matter that the court deems relevant to the nature of the crime and character of the defendant.... Any such evidence which the court deems to have probative value may be received, regardless of its admissibility under the exclusionary rules of evidence, provided the defendant is accorded a fair opportunity to rebut any hearsay statements.
§ 921.141(1), Fla. Stat. (1997); see Rutherford v. State, 727 So.2d 216, 221 (Fla.1998) (recognizing the "wide latitude permitted *93 in admitting penalty-phase evidence"); Hildwin v. State, 531 So.2d 124 (Fla.1988) (recognizing a different standard for judging the admissibility and relevance of evidence in the penalty phase than in the guilt phase).
It is also a well-settled rule that relevant evidence is evidence which tends "to prove or disprove a material fact," § 90.401, Fla. Stat. (1997), and all relevant evidence is generally admissible unless the law provides otherwise. Id. § 90.402. In this case, it is undisputed that one of the victim's fatal wounds occurred when his jugular vein was severed with a knife. Accordingly, this part of Melissa Perry's testimony was at least relevant to the "coldness" prong of CCP and to rebut the defendant's argument that the killing was the result of panic or rage resulting from the sexual advance by the victim. See Woods v. State, 733 So.2d 980, 991 (Fla. 1999) (holding "coldness" prong of CCP is when killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or fit of rage).[16]
Given the relevance of Perry's statement to at least the "coldness" prong of CCP, as well as recognizing the broad admissibility standard for penalty phase proceedings established by our Legislature, the trial court did not abuse its discretion in admitting Perry's statement about being able to kill someone by cutting the jugular vein.
WELLS, C.J., concurs.
NOTES
[1] Perry claims that: (1) the trial court erred in denying the motion for judgment of acquittal of first-degree murder because the evidence was insufficient to prove premeditation or the alleged underlying felony of robbery; (2) the trial court erred in not allowing defense counsel to question prospective jurors regarding whether they understood that a life sentence option for first-degree murder actually means life without parole; (3) the trial court erred in allowing the State to call Perry's ex-wife as a State witness and to elicit on direct examination testimony of irrelevant, specific, uncharged acts of violence which constituted evidence of nonstatutory aggravation; (4) the trial court erred in instructing the jury and in finding that the homicide was especially heinous, atrocious, and cruel; (5) the trial court erred in instructing the jury and in finding that the homicide was committed in a cold, calculated, and premeditated manner; (6) the trial court erred in instructing the jury and in finding that the homicide occurred during the commission of a robbery; (7) the trial court erred in refusing to give the requested instruction that the judge must give the jury's sentencing recommendation great weight; and (8) the trial court erred in sentencing Perry to death since such a sentence is disproportionate.
[2] During voir dire, the following colloquy occurred:

[Defense Counsel]: Okay. Now, with respect to a penalty phase, I have to ask a few questions. In a penalty phase in a murder trial, should they go that farthere are only two options in this casedeath by electrocution oryou don't have to specify that, but it will be a votea majority vote for death or for life imprisonment. That will be the only other result. It will be by simple majority. That's the only result that could happen if a first-degree verdict goes to the jury and there's a finding of guilt. Is there anyone laboring under the misperception that life imprisonment in Florida means life imprisonment and not a term of shorter years due to parole?
[Prosecutor]: Your Honor, I object as to relevancy.
[The Court]: I agree. I'm going to sustain the objection.
[3] Nor did Perry seek to explore other permissible bounds of voir dire, such the biases or attitudes of prospective jurors on this issue. See Pait v. State, 112 So.2d 380 (Fla.1959) (holding no error where prosecutor propounded question to prospective jurors concerning their attitudes toward felony murder rule).
[4] Nor did the prosecutor ever impermissibly argue that a life sentence meant anything other than life without parole or argue that the law may change some day. See Urbin v. State, 714 So.2d 411, 420 (Fla.1998).
[5] Other jurisdictions have addressed this precise issue and found no error. See, e.g., People v. Ashmus, 54 Cal.3d 932, 2 Cal.Rptr.2d 112, 820 P.2d 214, 225-27 (1991) (commenting that "trial court might properly have prohibited such examination [regarding life imprisonment and no possibility of parole] altogether"); Spivey v. State, 253 Ga. 187, 319 S.E.2d 420, 429 (1984) (holding "trial court did not err by refusing to allow [the defendant] to ask veniremen ... whether they thought life imprisonment would allow the possibility of parole"); State v. Lee, 335 N.C. 244, 439 S.E.2d 547, 559 (N.C.1994) (holding trial court did not abuse discretion by refusing to allow the defendant to question jurors regarding "the subject of parole eligibility and meaning of `life imprisonment'").
[6] This, however, is not a wholly circumstantial case. Perry told the Escambia County deputies who arrested him in New Orleans that he stabbed Johnston and took his wallet from the motel room and at trial admitted being in the motel room with Johnston, having a bloody knife in his hand after Johnston was dead, and fleeing the scene with some of Johnston's property. A confession is direct, not circumstantial, evidence of guilt. See Walls v. State, 641 So.2d 381, 390 (Fla.1994). Moreover, Perry's fingerprint and traces of his blood were found in the room. See Orme v. State, 677 So.2d 258 (Fla.1996).
[7] Perry testified with clarity as to the specific amounts and types of alcohol and drugs he allegedly consumed on the night of the murder, but later testified he was unsure about the amount he consumed that night. Moreover, despite his consumption of alcohol and drugs, testimony pointed to numerous instances of Perry's purposeful conduct immediately before and subsequent to the murder, such that the jury was justified in rejecting his theory of inability to form intent, e.g., he won all but one of numerous games of pool that he played that evening; upon returning to the motel room, he reversed direction of his sleeping bag because of a light shining in his eyes; after noticing Johnston was dead, he managed to gather all of his belongings, except for a crack pipe under the bed and a pair of broken sunglasses, as well as Johnston's wallet, the truck keys, and the security chip needed to start the truck; and shortly after the time of the murder, a motel guest in the next room testified that she watched someone who looked very similar to Perry drive away in Johnston's truck and the man had no trouble backing the truck out of its parking space and did not appear to be intoxicated.
[8] Perry relies on Kirkland v. State, 684 So.2d 732 (Fla.1996), and Coolen v. State, 696 So.2d 738 (Fla.1997), but these cases are factually distinguishable. This Court held that Kirkland had no motive for killing his victim, used weapons of opportunity, and, apparently, had no preconceived plan. Here, on the other hand, Perry had a well-planned motive of stealing Johnston's money and truck and used a knife other than his boot knife to kill Johnston. Coolen and his victim were both intoxicated, and Coolen killed him during "an escalating fight over a beer." Id. at 742. In the instant case the jury rightfully did not believe Perry's self-serving claims that he was too intoxicated to form the intent to kill Johnston.
[9] In Jones, 652 So.2d at 349-50, the Court applied the 1989 version of the State's robbery statute. Since that decision, the Legislature has not changed or amended the robbery statute.
[10] Perry's version of events, however, raises several inconsistencies. First, Perry specifically told police officers after he was arrested that he took Johnston's wallet from the "motel room." Second, Perry testified at trial that he found Johnston's wallet, containing the $60 and Johnston's license, in the truck's glove compartment. Perry also testified that he sat in the truck while Johnston checked into the motel and, despite being the last one out of the truck once they got to the motel room, Perry never saw Johnston take the wallet from, or put the wallet in, the truck's glove compartment. Yet, there was testimony from a clerk at the motel, that Johnston displayed his driver's license for identification and his AARP card to obtain a senior citizen's discount.
[11] In Mahn v. State, 714 So.2d 391, 397 (Fla.1998), this Court reversed an armed robbery conviction even though cash and an automobile were taken from the victim because the homicides appeared "to have been the product of Mahn's mental and emotional disturbance and prompted by jealousy for the father's attention," rather than a desire to obtain the victim's cash and car. In Knowles v. State, 632 So.2d 62, 66 (Fla. 1993), this Court rejected the robbery aggravator where Knowles, whom witnesses observed as being "completely gone" from alcohol and inhaling toluene, engaged in the apparently senseless shooting of a young girl he did not even know immediately before shooting his father and taking his father's truck. In Clark v. State, 609 So.2d 513, 515 (Fla.1992), this Court rejected the robbery aggravator (but upheld the pecuniary gain aggravator) where Clark killed the victim "for the purpose of obtaining the victim's paying job," but also took cash and boots from the victim after he was murdered. In Parker v. State, 458 So.2d 750, 754 (Fla. 1984), this Court rejected the robbery aggravator (but upheld the pecuniary gain aggravator) where "the entire sequence of events in which the murders occurred was touched off by Parker's desire to establish a remunerative drug-dealing network and his need to establish a reputation as a collector of debts," and "[t]he motive expressed at the time of the killing [of one of the victims from whom jewelry was taken] was to keep the victim from implicating the murderers in the death of [another victim]."
[12] Melissa Perry's testimony during the penalty phase included no less than seven statements regarding Perry's violent behavior, all unrelated to the crime charged: (1) "Leo [Perry] had beat him up pretty bad, so bad that they carried him to the hospital in an ambulance"; (2) "Leo was hitting him and kicking him"; (3) "He [Perry] came to the store and said that he thought he had killed Steve"; (4) "[H]e said he had to get out of there because he thought he had killed Steve"; (5) "Leo got mad because SteveI guess because he wasn't dead"; (6) "[Perry] grabbed him, and drug him out of the street, beat on him in the yard, drug him back in the house, beat on him some more in the house until he was unconscious"; (7) "Leo was still kicking Steve, he had on steel-toe boots and kept kicking Steve."
[13] Melissa Perry's testimony included the following statements: (1) "He [Perry] he grabbed me and shoved me against the fireplace"; (2) "When they seen him shove me against the fireplace, they came inside and called an ambulance for Steve"; and (3) "He [Perry] used to slap me. He would beat me. When he was drinking, he would get angry and would hit me with things, whatever he could grab that was closest; clothes hanger, shoes. He was bad about slamming me up against the walls and he tried to choke me a few times."
[14] Arguably, the defense was also placed in the position of having to ameliorate the impact of the alleged criminal behavior evidence the State introduced in its case. In addition to cross-examination of Melissa Perry, the defense recalled her as a defense witness to provide additional information about the context of some of the incidents she described in the State's case. Leo Perry had to address these incidents during his own testimony. Furthermore, Perry had to testify about his criminal record to place this testimony of criminal behavior in context since he had no convictions for crimes of violence. Indeed, the erroneous admission of this prejudicial evidence may have prompted the defense to choose to include the instruction on this mitigating circumstance to ameliorate the impact of the evidence. Furthermore, waiving reliance on the mitigating circumstance in order to preclude the introduction of such prejudicial evidence was no longer an option for the defense. See Maggard v. State, 399 So.2d 973 (Fla.1981). Finally, defense counsel argued in closing to juxtapose Perry's nonviolent criminal record against the evidence the State presented about alleged acts of violence.
[15] Moreover, based on the record before us, there is a lack of competent substantial evidence to support a finding of "heightened premeditation" and, thus, CCP as an aggravator must fail. While "heightened premeditation" may be inferred from the circumstances of the killing, it also requires proof beyond a reasonable doubt of "premeditation over and above what is required for unaggravated first-degree murder." Walls v. State, 641 So.2d 381, 388 (Fla.1994).

In its sentencing order, the trial court obviously relied on this comment made by Perry to his ex-wife six years prior to the murder in establishing the "heightened premeditation" prong:
The nature of the wounds inflicted, one of which severed the jugular vein, was a method of killing that the Defendant had discussed with Melissa Perry when he advised her that you did not need a big knife to kill a person, only a small knife provided hat [sic] you cut the jugular vein.
Sentencing Order at 5, State v. Perry, No. 97-4992 (Fla. 1st Cir.Ct. Aug. 26, 1999). This Court, however, has held that a "general statement made several weeks before the murder in reference to what [the defendant] would do if he were involved in a situation similar to [one encountered during the murder]... [cannot be construed] as sufficient evidence of a cold, calculated, and premeditated plan." Hardy v. State, 716 So.2d 761, 766 (Fla.1998) (emphasis added). Therefore, a general statement made over six years prior to the murders would be insufficient to support the "heightened premeditation" prong of CCP in this case.
[16] Nor can it be said that Melissa Perry's testimony regarding Perry's statement was the type that would have inflamed jurors or improperly appealed to its emotions in violation of Section 90.403, Florida Statutes (1997).