# Third District Court of Appeal

## State of Florida

Opinion filed November 6, 2024.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D23-0434
Lower Tribunal No. F20-15994

_____

**Eduardo Acosta,**
Appellant,

vs.

**The State of Florida,**
Appellee.

An Appeal from the Circuit Court for Miami-Dade County, Daryl E. Trawick, Judge.

Carlos J. Martinez, Public Defender, and Susan S. Lerner, Assistant Public Defender, for appellant.

Ashley Moody, Attorney General, and David Llanes, Assistant Attorney General, for appellee.


Before LOGUE, C.J., and EMAS and SCALES, JJ.

LOGUE, C.J.

A jury convicted Eduardo Acosta of two counts of attempted second-degree murder, two counts of aggravated assault, and one count of armed robbery with a firearm, the jury finding that, in the course of committing the crimes, the Defendant discharged a firearm. The trial court sentenced him accordingly. The Defendant appeals his convictions and sentences. After careful examination of the record, we find the trial court committed no reversible error and affirm.

## BACKGROUND

On November 3, 2020, the day of the 2020 presidential election, Alfredo Garcia and Wilson Peralta encountered the Defendant on a small island in Biscayne Bay near the Rickenbacker Causeway. An altercation occurred between the Defendant, Garcia, and Peralta that resulted in the State charging the Defendant with two counts of attempted first-degree murder, two counts of aggravated assault, and one count of armed robbery. Garcia and Peralta were the victims of these crimes. What happened during this altercation is disputed.

At trial, the victims testified the following occurred. Garcia owned a jet ski and attached a blue flag to it that read, "I'm Ridin' with Biden." On November 3rd, around noon, Garcia and Peralta took the jet ski to the island.

Beforehand, they smoked marijuana but testified they did not smoke enough to feel impaired.

They spent a few hours alone on the island, sipping White Claws, until a small group of people arrived on jet skis. The Defendant was in this group. Garcia was interested in the Defendant's jet ski, so he approached him and asked him what year it was. The Defendant then reacted aggressively, lunging at Garcia and insulting him. He shouted at Garcia telling him that Biden was a child molester and called Garcia a Mexican child rapist. The people with the Defendant grabbed the Defendant and held him back. The Defendant was eventually released, went over to Garcia's jet ski, and tore down Garcia's Biden flag. Garcia then took out his phone and began recording short clips of the Defendant. Peralta also intervened, telling the Defendant to calm down. The Defendant did not calm down. Instead, he reached for a black bag in the dry compartment of his jet ski. The other people with the Defendant tried taking the bag away from him. Garcia then called 911 and requested police intervention.

Before the police could arrive, the Defendant jetted away with his friends. Peralta testified that he saw the friends ski over to a party boat nearby. But the Defendant circled around and came back. Seeing the Defendant was back, Garcia and Peralta hopped onto Garcia's jet ski and

tried to leave. As they did, they saw the Defendant go for the black bag again. Peralta testified that he saw the Defendant open the black bag and pull out a black handgun with a yellow stripe. The two then jetted off the island without putting on life jackets. But the Defendant chased them.

Garcia drove while Peralta hung onto him from behind. They went about 60 miles per hour. At one point, Peralta turned around and saw the Defendant pointing his gun at them. Garcia and Peralta both testified they then heard the gun fire once and a bullet fly by their heads. Terrified, Garcia began to intentionally drive erratically to lose the Defendant. They then came upon a boat and drove in circles around it yelling for help. Garcia then took too sharp of a turn and the two were thrown off.

As they were treading water, the Defendant drove up to them. He went up to Peralta first, pointed the gun to his head and told him to admit that he was a child molester. Peralta told the Defendant that he was just a kid and begged for his life. The Defendant spared Peralta, then went to Garcia and did the same. The Defendant then warned Garcia and Peralta to never come back to the island again or he would kill them. The Defendant then drove over to Garcia's jet ski, tied it to his and towed it away.

A couple of the Defendant's friends then skied over to Garcia and Peralta, picked them up, and dropped them back off on the island. A police

4

boat arrived minutes later. The police took Garcia and Peralta to Key Biscayne where the two had parked. Garcia then used an iPad to find his jet ski. He was able to do so because he left his cell phone in it and was able to locate his cell phone via the iPad. The police then recovered Garcia's jet ski from a manatee sanctuary that had signs around it restricting public entry.

Within the next day, Garcia began to scour social media for the Defendant. He quickly identified the Defendant's personal and professional Instagram accounts. On one of the Defendant's accounts, the Defendant posted two videos he recorded prior to November 3rd. In one video, Garcia is seen with his Biden flag on the same island. At one point, the video zoomed in on Garcia and the Defendant is heard calling Biden supporters pedophiles. Garcia was shown the video at trial, and he identified himself in the video and the Defendant's voice. The other video showed the Defendant filming flags with President Donald Trump's name on them and he appeared to have a positive reaction.

During cross, the defense attempted to impeach both victims' testimony of the chase by playing security footage shot from Key Biscayne. The defense suggested through its questioning that the video did not show a chase occurred. The defense conceded that a gun was fired in the video.

But the defense intimated that the bullet did not land in a manner consistent with the gun being fired intentionally at the victims.

The State also admitted a 911 call made by an anonymous witness. The witness stated that she saw someone point a gun and shoot at two people on a jet ski in the location of the incident.

When the State rested the Defendant moved for a judgment of acquittal on the attempted murder and the robbery charges.[1] Starting with the robbery charge, the Defendant argued that the State did not prove that he used force or the threat of force to take Garcia's jet ski. He reasoned the evidence did not show that (1) he "contemporaneously" pointed his gun at the victims and took the jet ski; (2) he intended to take the jet ski when he pointed the gun at the victims; and (3) the victims had control over the jet ski when he took it. The Defendant contended that, at most, his actions amounted to aggravated assault and theft, but not robbery.

As to the attempted murder charges, the Defendant argued the State did not prove that the Defendant intentionally fired his gun. Rather, the security footage showed he accidentally fired it. The defense maintained that a splash of water could be seen in the video right after the gun fired, and the

---

[1] The defendant "stipulate[d] that the prima facie elements have been met" for the aggravated assault counts.

6

location of the splash was inconsistent with the theory that the Defendant shot at the victims. Thus, the Defendant clearly did not intend to shoot at them.

After the trial court denied the motion, the Defendant testified and relayed a different version of events. In relevant part, he testified that the victims had been drinking and smoking marijuana right before the interaction. He also testified that Garcia was the initial aggressor, that Garcia randomly came up behind him and tried to strangle him, and that Peralta recorded the interaction from behind a tree. Further, when his friends left the island, the victims drove off at the same time, leaving the Defendant alone on the beach. But he saw the victims returning to the island, and he feared they were going to harm him, so he left and followed behind them to make sure they could not shoot at him, even following them as they circled the boat. He explained that he pulled out his gun at that point. And that the gun accidentally discharged when he did so because the water was choppy. He admitted taking Garcia's jet ski. But he explained he did so not to permanently deprive them of it, but because he did not want the victims to get back on the jet ski and threaten him further.

At the close of all evidence, the Defendant renewed his motion for a judgment of acquittal. The trial court again denied it.

The jury ultimately returned a guilty verdict, finding the Defendant guilty as charged on all counts but the attempted first-degree murder charges, instead finding him guilty of two counts of attempted second-degree murder. The jury also found, in the special interrogatories, that the Defendant discharged a firearm in the commission of the robbery. The trial court entered its judgment accordingly.

Before the trial court entered its sentences, the Defendant moved for a new trial and renewed its motion for a judgment of acquittal a second time. In arguing for a new trial, the Defendant maintained the jury could not find he discharged a firearm during the robbery because such a finding was contrary to the weight of the evidence, which indicated the gun was shot prior to when the alleged robbery began. In his second renewed motion for a judgment of acquittal, the Defendant raised the same issues as at trial. After a hearing, the trial court denied the motions.

The trial court then held a sentencing hearing. There the trial court determined that because the jury found the Defendant discharged his gun during the commission of his attempted murders and robbery, his sentences for these convictions were "enhanced" to the 20-year mandatory minimum found in § 775.087(2), Florida Statutes. The Defendant timely appealed his convictions and sentences.

8

## ANALYSIS

The Defendant argues the trial court erred when it admitted the Defendant's Instagram videos, and when it denied his motions for a judgment of acquittal and for a new trial. None of these arguments have merit.

### A. The Defendant Failed to Preserve the Issue of the Admission of the Instagram Videos.

The Defendant maintains his Instagram videos were irrelevant to the State's case and the trial court thus erroneously admitted them. But the Defendant did not move to exclude or otherwise object to the admission of the videos. The issue is thus unpreserved for this Court's review. See Lubin v. State, 286 So. 3d 811, 813 (Fla. 3d DCA 2019) (holding that the defendant's failure to contest the admission of character evidence at trial precluded him from raising the issue on appeal).

Moreover, the Defendant did not argue that the admission of the videos fell under the fundamental error exception to the preservation rule. Nor can he, as the videos were ultimately relevant to show the Defendant saw Garcia before the incident with his Biden flag which would go to the issue of premeditation. Plus, the video the Defendant took of the Trump flags was admissible because the State's theory was that the Defendant was, at least in part, politically motivated. See § 90.404, Fla. Stat. (2024) ("Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to

9

prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.").

**B. The Trial Court Correctly Denied the Defendant's Motions for a Judgment of Acquittal.**

The Defendant contests the sufficiency of the evidence supporting his armed robbery and attempted second-degree murder convictions. "When the defendant in a criminal appeal challenges the sufficiency of the State's evidence, the appellate court conducts a de novo review of the trial record to ensure that the guilty verdict is supported by competent, substantial evidence regarding each element of the charged crime." Garcia v. State, 373 So. 3d 1213, 1222 (Fla. 3d DCA 2023), rev. denied, SC2023-0668, 2023 WL 6389749 (Fla. Sept. 29, 2023) (quoting Rodriguez v. State, 335 So. 3d 168, 171 (Fla. 3d DCA 2021)). "In conducting its review of the record, the appellate court does not reweigh the evidence, but simply determines whether competent, substantial evidence has been presented by the State as to each element of the crime." Id. (citing Durousseau v. State, 55 So. 3d 543, 556 (Fla. 2010)). And the State did so here.

**1. Robbery Conviction**

To prove armed robbery, the State needed to show the Defendant (1) took "property which may be the subject of larceny from the person or custody of another"; (2) "with intent to either permanently or temporarily deprive the person" of the property; (3) "when in the course of the taking . . . use[d] [ ] force, violence, assault, or putting in fear"; and (4) "in the course of the taking . . . carried a firearm or other deadly weapon." §§ 812.13(1), (2)(a) Fla. Stat. (2024).

The Defendant argues the State failed to prove the first and second elements.[2] As to the first element, the Defendant argues that because he took the jet ski after the victims were thrown off it, and when it was floating away from them, he did not take it from their custody. But "property need not be in 'the actual physical possession or immediate presence of the person who was robbed' for a taking to occur." Ridgeway v. State, 128 So. 3d 935, 938 (Fla. 1st DCA 2013) (quoting Perry v. State, 801 So. 2d 78, 86–87 (Fla. 2001)). "Property is taken from 'the person or custody of another' if it is sufficiently under the victim's control so that the victim could have prevented

---

[2] The Defendant also contests the third and fourth elements to the extent the jury found that he carried and discharged his gun during the commission of the robbery. But because he raised this issue in his motion for a new trial and not in the acquittal motions, we address these issues in our analysis of the trial court's denial of the Defendant's motion for a new trial.

the taking if she had not been subjected to the violence or intimidation by the robber." Perry, 801 So. 2d at 87.

The State presented sufficient evidence showing that the Defendant instilled fear in the victims and this fear prevented them from swimming back to the jet ski. While the Defendant suggests the jet ski may have drifted too far from the victims for them to swim to it, other than the Defendant's speculation, nothing in the record indicates it had. Thus, there was sufficient evidence to support the jury's finding that the jet ski was in the victims' custody when the Defendant took it.

As to the second element, the Defendant contends that when he used force, he did not do so with the intent of taking the jet ski. The taking was an "afterthought" constituting theft—but not robbery.

The "afterthought" theory has been squarely addressed by the Florida Supreme Court.

> Where an "afterthought" argument is raised, the defendant's theory is carefully analyzed in light of the entire circumstances of the incident. If there is competent, substantial evidence to uphold the robbery conviction, and no other motive for the [use of force] appears from the record, the robbery conviction will be upheld. Conversely, in those cases where the record discloses that, in [using force], the defendant was apparently motivated by some reason other than a desire to obtain the stolen valuable, a conviction for robbery (or the robbery aggravator) will not be upheld.

Id. (quoting Beasley v. State, 774 So. 2d 649, 662 (Fla. 2000)).

12

Based on the entire circumstances surrounding this incident, it was reasonable for the jury to find that the Defendant's goal was to take the jet ski. The Defendant ripping the Biden flag off the victims' jet ski and his comments disparaging Biden could reasonably indicate he did not want the victims driving the jet ski around the island flying the Biden flag ever again. Further, the Defendant pointed his gun at the victims while they were treading water and threatened to kill them if they ever went back to the island. From this evidence, a jury could also reasonably find the Defendant was intimidating the victims to not only make them fear retaliation if they returned to the island, but also so he could take the jet ski and ensure they could not. There was therefore sufficient evidence to support the jury's finding that the Defendant used force with the intent of taking the jet ski.

The trial court therefore properly denied the Defendant's motions for a judgment of acquittal on his armed robbery conviction.

### 2. Attempted Second-Degree Murder Convictions

To prove attempted second-degree murder, the State needed to show that the Defendant attempted[3] to kill a human being by engaging in "any act

---

[3] "A person who attempts to commit an offense prohibited by law and in such attempt does any act toward the commission of such offense, but fails in the perpetration or is intercepted or prevented in the execution thereof, commits the offense of criminal attempt[.]" § 777.04(1), Fla. Stat. (2024).

13

imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." § 782.04(2), Fla. Stat. (2024). The Florida Supreme Court explained that a defendant must have "intentionally committed" the imminently dangerous act. Coicou v. State, 39 So. 3d 237, 241 (Fla. 2010) (quoting State v. Florida, 894 So. 2d 941, 945 (Fla. 2005) (receded from on other grounds)).

The Defendant maintains the State did not prove he intentionally shot at the victims. He claims that the security footage "conclusively" shows that he accidentally discharged his gun—and because the footage contradicts the victims' testimony indicating he pointed his gun at them and shot, the trial court should have found that the video negated the testimony and entered a judgment of acquittal.

The Defendant relies on Wiggins v. Florida Department of Highway Safety & Motor Vehicles, 209 So. 3d 1165 (Fla. 2017) to argue that a court can independently review a video and find that testimony allegedly contradicting that video is incompetent and insufficient. But Wiggins is inapplicable here. It held that a court conducting a first-tier review of a "DUI license suspension . . . applies the correct law by rejecting [ ] testimony . . . when that testimony is contrary to and refuted by objective real-time video

14

evidence." Id. at 1175. Its holding is narrowly limited to DUI appeals, so it does not apply to this attempted second-degree murder appeal.

The law in Florida is currently unsettled as to whether, in other contexts, a court can review a video and independently find that it completely invalidates other evidence. Compare Lopez v. Wilsonart, LLC, 275 So. 3d 831, 834 (Fla. 5th DCA 2019), approved, 308 So. 3d 961 (Fla. 2020) ("[B]y finding that the video evidence, as compelling as it was, completely negated both the independent eyewitness testimony as well as the [ ] expert's opinion, the trial court improperly weighed competing evidence on material facts [at summary judgment under the old standard]. . . . [I]t would be the jury's job to assess the credibility of the [ ] witnesses as to the cause of the accident and to weigh and compare [ ] conflicting evidence, including the videotape.") with Scott v. Harris, 550 U.S. 372, 380–81 (2007) ("Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction [at summary judgment]; it should have viewed the facts in the light depicted by the videotape.").

Even so, the extent to which a video can ever conclusively show intent is questionable. Particularly here where the video is taken from far away and is grainy. The splash the Defendant claims was the result of the bullet

landing, could also be the result of any number of things, including a fish jumping out of the water. Even if the splash was from the bullet hitting the water, its location merely suggests that the Defendant's aim was off. It does not indicate whether he intended to pull the trigger. The jury was thus free to conclude, in light of all the evidence presented, that the Defendant intended to shoot the gun at the victims.

The trial court thus properly denied the Defendant's motion for a judgment of acquittal on the attempted second-degree murder conviction.

## C. The Trial Court Correctly Denied the Defendant's Motion for a New Trial.

The Defendant argues there should be a new trial on the armed robbery charge because, against the manifest weight of the evidence, the jury found that the Defendant discharged his gun during the commission of the robbery. The State responds that this issue is not reviewable on direct appeal. If it is, the trial court correctly denied the motion for new trial. While the State's procedural argument is unpersuasive, it correctly maintains that the trial court did not abuse its discretion when it found that the jury's finding was not contrary to the manifest weight of the evidence.

16

### 1. The Jury's Finding Is Reviewable on Direct Appeal.

In special interrogatories, the jury found that the Defendant discharged his gun during the commission of the robbery. The State contends this finding was an element of the sentencing enhancement found in § 775.087(2)(a)2., but was not an element of the underlying robbery which only required "force" be proven. And this was proven when the Defendant pointed his gun at the victims when they were in the water. So, the propriety of the jury's finding is a sentencing issue unrelated to the underlying conviction which the Defendant needs to first raise in a Florida Rule of Criminal Procedure 3.800(b) motion. While this may be a sentencing issue in part, the issue also goes to the underlying conviction—and to the extent it is a sentencing issue, it is one reviewable on direct appeal.

The jury's findings of fact triggered a mandatory minimum sentence of 20 years in prison. See § 775.087(2)(a)2., Fla. Stat. (2024) ("Any person who is convicted of a felony or an attempt to commit a felony listed in sub-subparagraphs 1.a.-p. or sub-subparagraph 1.r. [which include robbery], . . . and during the course of the commission of the felony such person discharged a 'firearm' . . . shall be sentenced to a minimum term of imprisonment of 20 years."). Challenging the sufficiency of this finding is not contemplated in rule 3.800(b).

17

Rule 3.800(b) is used to challenge errors made by the trial court in its sentencing orders, but not errors in the sentencing process. As the Florida Supreme Court explained in Jackson v. State, 983 So. 2d 562, 572 (Fla. 2008), it has "never held that any error that happens to occur in the sentencing context constitutes a 'sentencing error' under [rule 3.800(b)]. Instead, errors [it has] recognized as 'sentencing errors' are those apparent in orders entered as a result of the sentencing process." It gives examples of rule 3.800(b) sentencing errors which include: "claims that the defendant was improperly habitualized," "that the sentence exceeds the statutory maximum," "that the scoresheet was inaccurate," "that the trial court improperly imposed a departure sentence," and so forth. Id. These examples are technical errors in the trial court's order.

The validity of the jury's finding on a question of fact that triggers a mandatory sentence is not a technical issue and is reviewable on direct appeal. See, e.g., Pula v. State, 652 So. 2d 981, 982 (Fla. 5th DCA 1995) ("The validity of written reasons to support an upward departure from the permissible guidelines sentence is an issue that should and must be raised in the context of the direct appeal.").

Moreover, the jury's finding relates to the underlying armed robbery conviction. An element of robbery is the use of force. Shooting the gun would

18

satisfy this element. So, while the special interrogatory may have been included because it went to the sentencing issue, we cannot ignore the fact that it also satisfied an element of the robbery conviction. And this Court can certainly review the sufficiency of this finding on direct appeal.

### 2. The Jury's Finding Is Not Contrary to the Evidence.

The Defendant argues that the trial court should have granted him a new trial on the armed robbery conviction and corresponding mandatory sentence because the jury's finding that he discharged a firearm in the course of committing the robbery is "contrary to . . . the weight of the evidence." Fla. R. Crim. P. 3.600(a)(2). "A trial court's denial of a motion for a new trial is reviewed under an abuse of discretion standard. In order to demonstrate abuse, the nonprevailing party must establish that no reasonable person would take the view adopted by the trial court." Tundidor v. State, 221 So. 3d 587, 603 (Fla. 2017) (quoting Stephens v. State, 787 So. 2d 747, 754 (Fla. 2001)). The trial court did not abuse its discretion.

The jury finding that a firearm was discharged during the incident is not contrary to the weight of the evidence. Indeed, the Defendant does not contest this fact. Rather, he argues that the evidence does not support the finding that the gun was fired as part of a "continuous series of acts."

19

The robbery statute defines force used "in the course of the taking" as force occurring "either prior to, contemporaneous with, or subsequent to the taking of the property and if it and the act of taking constitute a continuous series of acts or events." § 812.13(3)(b), Fla. Stat. (2024). The sentencing statute uses the phrase "during the course of the commission of the felony," which is substantially the same phrase. § 775.087(2)(a)2., Fla. Stat. (2024).

Under these definitions, the jury's finding is not contrary to the weight of the evidence. The gun was fired during a rapid sequence of events ending with the Defendant taking the jet ski. There may have been a slight pause in the events, but not enough to tip the scales. The trial court thus did not abuse its discretion when it determined the jury's finding was not contrary to the weight of the evidence.

Affirmed.