# Supreme Court of Florida

_____

No. SC13-2090
_____

**KIM JACKSON,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[August 27, 2015]

PER CURIAM.

This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the conviction and the death sentence.

## FACTS

Debra Pearce was stabbed to death in her kitchen on or around October 17, 2004. The murder remained unsolved until 2008, when DNA from a hair found on Pearce's body was matched to Kim Jackson and a fingerprint found in blood on the sink above Pearce's body was also matched to Jackson.

## The Murder

Pearce was last seen by her mother between midnight and 1:30 a.m. on October 15 to 16, 2004. Pearce was discovered late in the evening on October 18, or in the early morning hours of October 19, by a neighbor and friend of Pearce who purchased drugs from her and used them at the house. That evening, the friend walked past Pearce's house and saw that the gate was open. Over the previous days, he had called her several times, but received no answer, and he had noticed that her van was not in her driveway. When he approached the house, he saw that the sliding glass door was open. He entered and found Pearce's body. He returned to his house and called the police.

The medical examiner determined that the cause of Pearce's death was hypovolemic shock due to vascular hemorrhage as a result of stab wounds to the neck and shoulder—in layman's terms, Pearce bled to death as a result of a fatal stab wound to her neck that struck her jugular vein and a fatal stab wound to her chest/shoulder area that struck her subclavian artery and vein. The stab wound to the chest pierced through Pearce's bra, sliced her left breast, continued across into the right side of her chest, and pierced her scapula. The knife, which had been left in Pearce's chest, was only five inches long, but it had penetrated seven to eight inches into her body. The blow with the knife was forceful enough to pierce the

scapula and break off a 3/4 inch area of bone, and the wound would have caused a significant amount of blood loss as well as an arterial blood spurt pattern.

The medical examiner also found several other injuries. Because the body was in the early stages of decomposition, the medical examiner could not determine whether certain injuries were lacerations or incisions. One such injury was a superficial wound to Pearce's forehead, and another was a wound to her left cheek. Additionally, there were two wounds to Pearce's chin—one where the blade entered, and the other where the blade exited. Pearce also had two cuts across her ear, a scrape or abrasion on the left side of her head that indicated she had been hit or her body was dragged, and five shallow cuts on the left side of her head. Her right eye was bruised from a forceful blow. Additionally, Pearce had two lacerations/incisions to her right forehead that were jagged, due to either a knife with a dull blade, or the blade of a knife being raggedly ripped across her skin.

The medical examiner could not be certain as to whether Pearce was conscious throughout the attack, but stated that it was possible because she bled to death—she was not knocked unconscious, her spinal cord was not severed, and no major organs were involved. Additionally, Pearce's right pinky finger had a deep cut that penetrated the tendons and was consistent with a defensive wound. Pearce also had a cut on the back of her left forearm that went from shallow to deep,

which could have occurred while she attempted to ward off a blow. Further, the medical examiner testified that minor blunt-force injuries which were present—including those to her forehead, head, and ear—demonstrated that she struggled.

A crime scene reconstructionist was called to Pearce's house on October 19, and he noted that Pearce, who was face-down on the kitchen floor below the sink, had been dead for some time. The reconstructionist retrieved a dark-colored hair from the back of Pearce's right calf that appeared out of place. He observed the knife that had been left in Pearce's chest and also found a second knife beneath her body.[1] Additionally, the reconstructionist found significant blood spatter in the kitchen and determined that the spatter around the sink was consistent with either a weapon being swung back, or from the impact when the weapon was swung down. He also discovered a fingerprint in blood on the lip of the sink.

The reconstructionist utilized luminal testing on red stains detected on the rug outside of the kitchen, which revealed an impression left by a person wearing a sock, and another impression left by a person wearing a shoe. He testified that it appeared as though the person who left the tread dragged his or her feet, and the tread appeared to lead toward the master bathroom. He could not determine

---

1. The small knife located under Pearce tested positive for the presence of blood, and presented a mixed profile with Pearce as a major contributor. Two to three other DNA profiles were present on the knife, and Jackson was excluded as being one of the possible contributors.

whether the impressions had been left by more than one person and stated that it was possible more than one person had been at the scene.

The investigation revealed that around the time of the murder, an eyewitness saw three individuals near the back of Pearce's house. The lead detective spoke with two of these individuals, who admitted that they took several items from the house, including a television, a VCR, and a DVD player. However, no forensic evidence linked these individuals to the home or Pearce.

Fingerprints that were found at Pearce's house were submitted to the Florida Department of Law Enforcement (FDLE) latent print unit in Jacksonville. The analyst there determined that none of the prints were of value. However, the lead detective discovered that the Pinellas County unit possessed equipment that could enhance latent prints, and the sink was transported there so that more detail could be obtained from the latent fingerprint located on the sink. Although the equipment did not prove to be particularly useful, the Pinellas County latent print unit examined the photographs of the sink fingerprint and determined that it was of value. However, no match for the fingerprint was found at that time. The lead detective also submitted photographs of several of the prints lifted from Pearce's house to the Federal Bureau of Investigation (FBI). The FBI determined that among the prints it received, one latent fingerprint was of value (the sink

fingerprint), and one latent palm print was of value. The FBI was also unable to match either print to any known individual at that time.

Identification

It was only later that FDLE matched DNA extracted from the hair that was found on Pearce's calf to Jackson.[2] After receiving this information, the lead detective located Jackson in Georgia, where he had been incarcerated since 2005. During an interview with Jackson on January 22, 2008, the lead detective asked whether Jackson knew Pearce or had been to her house. The detective showed Jackson a photograph of Pearce, as well as several pictures of her house. Jackson asserted that he had never met or seen Pearce, and had never been to her house.

After Jackson was identified as a suspect, latent print analysts with the FBI and Pinellas County were asked to compare Jackson's known prints with the fingerprint from the sink. Jacqueline Slebrch, the FBI latent print examiner, examined the photograph of the sink fingerprint.[3] She noted spots or distortion on the fingerprint, and that the fingerprint was one of multiple prints left on top of

_____

2. The record does not clearly state when the identification was made. However, the lead detective testified that he located Jackson after he obtained the DNA and fingerprint evidence, and the interview of Jackson occurred in January 2008.

3. Slebrch was not the first FBI analyst to examine the prints, which were first examined by an analyst who later left the FBI. Slebrch performed her own analysis, and her conclusions matched those made by the first FBI analyst.

each other. However, she determined that the print was of value and matched the right ring finger of Jackson. With respect to when the fingerprint could have been placed on the sink, Slebrch testified that she had never encountered a situation in which a fingerprint was left and, at a later date, captured and preserved by being coated in a substance such as blood, but that such an occurrence could be possible. She also explained that when a person has an excess amount of blood or other substance on his or her hand and then touches a surface, the substance will be pushed between the friction ridges on a fingerprint, and an imprint of the furrows will be left on the surface. She testified that this is a factor to consider when looking at a latent print such as the sink fingerprint.

The sink fingerprint was also examined by William Schade, who worked for the Pinellas County Sheriff's Office. Like Slebrch, he concluded that the sink fingerprint matched the right ring finger of Jackson, and that the fingerprint was left on the sink while Jackson's finger was coated in a wet substance, such as blood. When Schade made the comparison, he had no knowledge that Slebrch had also concluded that the sink fingerprint matched the right ring finger of Jackson.

However, during trial, Jackson presented the testimony of Michelle Royal, the Jacksonville Sheriff's Office latent print analyst who concluded that the sink fingerprint was of no value and could not be used to identify any suspect. She nonetheless testified that even prints of no value can be used to exclude suspects,

and acceded both that Jackson could not be excluded as the individual who left the sink fingerprint, and that similarities existed between the sink fingerprint and the known print of Jackson.

Alibi

Jackson presented as an alibi that he visited Adel, Georgia, between October 15, 2004, and October 22, 2004, to celebrate his birthday with his family, which he did every year for a weekend around his birthday. His birthday is October 13, which fell on a Wednesday in 2004. October 15 was the Friday that followed his birthday. The testimony of Jackson and his wife, sister, and father presented as an alibi that his cousin drove him to Adel on Friday, October 15, and he did not return until after the murder occurred. He had intended to return on Sunday with his cousin, but did not, and later obtained money from a friend for bus tickets, missed the initial bus, and eventually returned to Jacksonville by bus on October 22. The friend who provided Jackson with bus money testified that she recalled that Jackson visited her work place in October 2004, but she could not recall the date.

Jackson testified that he knew Pearce through her boyfriend, had met her between five and ten times, and had been to her house approximately five times. He had previously purchased crack cocaine from Pearce's boyfriend, as well as from Pearce. He also testified that he and Pearce had become comfortable interacting with each other, and that she would let him enter her house.

Jackson explained that when he was interviewed by the lead detective, he did not admit that he knew Pearce or that he had been to her house because he knew the detective was investigating a homicide, wished to distance himself from Pearce, and did not want to be implicated in something he did not do. He also testified that he did not recognize Pearce in the photograph he was shown during the interview because it was in black and white, and she appeared dead in the photograph.

Jackson testified that he had been at Pearce's house one week before his trip to Adel, and he helped move a couch while he was there. Jackson explained that his fingerprint could be on the sink because he had removed a rag from the garbage disposal and placed his hand on the sink while he looked under it. He admitted that his hands were not bloody when he repaired the disposal, and that this occurred months before the murder.

In rebuttal, the State presented the lead detective, who testified that Pearce's vehicle was found on the same road where Jackson resided at the time of the murder. The vehicle was approximately one to one and a half miles from his residence. However, no evidence connected Jackson to the vehicle.[4]

---

4. The upholstery covering of the armrest tested positive for blood, and the DNA profile matched Pearce. Additionally, a mixed DNA profile with Pearce as the major contributor was found on the steering wheel cover of the vehicle. The DNA results with respect to the second contributor were inconclusive, but the FDLE DNA analyst testified that the second contributor was male.

Because the evidence suggested that another person may have been present during the murder—i.e., the footprints and the second knife with DNA that did not match Pearce or Jackson—the State requested that a principal instruction be given. The trial court agreed, and a principal instruction was read to the jury. On April 17, 2013, the jury found Jackson guilty of the first-degree murder of Debra Pearce.

### Penalty Phase

During the penalty phase, the State presented the victim impact statements of Pearce's mother and daughter. The parties stipulated to two aggravating circumstances: (1) Jackson was on probation at the time of the murder, and (2) Jackson was previously convicted of three violent felonies.[5] Additionally, despite the stipulation, the State presented the testimony of the victims of two of the prior violent felonies. The victim of the armed robbery testified that Jackson robbed her at gunpoint while she was at work. The surveillance video of the event was played for the jury. The victim of the aggravated assault testified that he worked for the Georgia Bureau of Investigation and, while he was assigned to purchase cocaine while undercover in the Adel area, he unsuccessfully attempted to purchase crack

---

5. These felony convictions were: (1) a 1988 conviction for robbery; (2) a 1992 conviction for aggravated assault; and (3) a 2006 conviction for armed robbery. Jackson was on probation at the time of the murder for the 1992 aggravated assault conviction. The trial court ultimately based the aggravating circumstance of prior violent felony only on the second two felony convictions because there was no indication that the 1988 robbery, which was from Georgia, actually involved violence.

from Jackson.  However, when he approached another individual, Jackson ran up, pushed the individual out of the way, pulled his shirt up, and pulled out a gun.

Jackson presented the testimony of forensic psychologist Dr. Jerry Valente, who met with Jackson twice to determine whether he was competent for trial.  Dr. Valente performed a standardized intelligence test on Jackson, and determined that Jackson is of low-average intelligence.  Specifically, Jackson's IQ is within a 10-point range of 84.  His brain is fully developed and he completed the 12th grade. Dr. Valente testified that Jackson displayed no evidence of psychosis, neurosis, or hallucinations, and was cooperative, well-mannered, and respectful of authority. Dr. Valente described Jackson's psychological profile as flat and with nothing of clinical significance.

Jackson also presented several people who testified with respect to his positive attributes, including that he: (1) was good at sports; (2) worked well with others; (3) coached and participated in softball; (4) was a role model and a leader; (5) was caring, supportive, and kind; (6) was upbeat; (7) motivated and encouraged others; (8) was dependable; (9) was helpful; (10) was humble; (11) was respectful; (12) was religious and attended prayer meetings; (13) spoke well of and displayed genuine concern for others; (14) regretted and was sorry for certain actions during his life, and wished to be and do better; (15) was a hard worker, who did good work, was prompt, and did not complain about long hours; (16) was protective;

(17) was trusted around and good with children; and (18) would be a positive influence in others' lives.

Jackson's father testified that he was in the Army when Jackson was a child and was stationed at various locations both within and outside of the United States. When the father was stationed in the United States, Jackson spent summers at the army bases. When the father was stationed out of the country, Jackson lived with his grandfather. The father described Jackson as a good child who had friends and played sports. He attended Jackson's games when he could, but often could not because of his work. The father believed that Jackson would be a productive person and would assist other prisoners if given a life sentence. He stated that he has a good relationship with Jackson and would continue to be involved in Jackson's life.

Several other family members testified, including Jackson's sister, half-sister, daughter, stepson, and wife. Jackson's sister and half-sister testified that he was a good influence and played sports. Jackson's sister testified he was protective of her as a child and taught her sports. Jackson's daughter and stepson testified that Jackson encouraged them to make good choices in life. His stepson testified that Jackson was a better influence and father figure than his biological father. Both the stepson and Jackson's wife described him as a good father and

- 12 -

husband. Additionally, his family members stated that Jackson is positive and that they intend to maintain a relationship with him during his incarceration.

In rebuttal, the State presented the testimony of a Georgia Department of Corrections employee, who testified that Jackson received nine disciplinary reports in 2007.

On April 26, 2013, the jury recommended a sentence of death by a vote of 8 to 4. The jury form required the jury to indicate whether Jackson played a significant role in the homicide of Debra Pearce. The jury unanimously found beyond a reasonable doubt that Jackson played a significant role in the homicide.

During the Spencer[6] hearing, the State presented victim impact statements of Pearce's mother and sister. The defense presented the testimony of a mitigation specialist, who testified that he spoke with Jackson's best friend, who would have been able to provide mitigation with respect to good deeds by Jackson.[7] The friend agreed to appear during the guilt phase, but then failed to respond to all attempts to contact him. The mitigation specialist stated that the friend had told him Jackson was in Adel in 2004 for Jackson's birthday.

---

6. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

7. The State objected to the mitigation specialist's testimony on the basis of hearsay, and the testimony was admitted only to assist the trial court in assessing the mitigating evidence already presented and to explain the steps taken by the investigator to contact the friend.

On October 1, 2013, the trial court sentenced Kim Jackson to death for the murder of Debra Pearce. The trial court found the State had proven beyond a reasonable doubt the existence of three aggravating circumstances: (1) Jackson had previously been convicted of two felonies that involved the use or threat of violence (great weight); (2) Jackson was under felony probation at the time of the murder (great weight); and (3) the murder was especially heinous, atrocious, or cruel (HAC) (great weight).

Jackson presented numerous nonstatutory mitigating circumstances. The trial court found that sixty-six had been established, and grouped them into twelve categories. Additionally, within the twelve categories, the trial court often discussed several factors together in assigning them weight. The trial court found that Jackson did not prove the mitigating circumstance that he is religious/faith based and guided his daughter spiritually.

The first category of mitigation found by the trial court is that Jackson is a good father and husband and shares the love of his family. The trial court found twenty-four mitigating circumstances within this category: (1) Jackson is a good father to his daughter (moderate weight); (2) Jackson encouraged his daughter to study (some weight); (3) Jackson encouraged his daughter to go to college (some weight); (4) Jackson encouraged his daughter to grow beyond Nashville, Georgia (some weight); (5) Jackson is involved in his daughter's life and taught her right

- 14 -

from wrong (some weight); (6) Jackson's daughter intends to maintain a relationship with Jackson (some weight); (7) Jackson and his daughter love each other (moderate weight); (8) Jackson assumed the role of stepfather and went beyond his legal responsibilities (moderate weight); (9) Jackson was involved in raising his stepson (moderate weight); (10) Jackson is a good father to his stepson (moderate weight); (11) Jackson has been a good role model to his stepson (some weight); (12) Jackson taught his stepson the value of hard work (some weight); (13) Jackson taught his stepson to have a good work ethic (some weight); (14) Jackson taught his stepson and they worked together for more than one year (some weight); (15) Jackson encouraged his stepson to study (some weight); (16) Jackson was a good athlete and instructed his stepson athletically (slight weight); (17) Jackson provided emotional encouragement to his stepson[8] (some weight); (18) Jackson and his stepson love each other (moderate weight); (19) Jackson's stepson maintains a relationship with him and communicates with him through his mother (slight weight); (20) Jackson's stepson intends to continue a relationship with him (slight weight); (21) Jackson is a good husband, friend, and companion (moderate weight); (22) Jackson's wife will continue to foster a relationship with and visit

8. This mitigating factor was presented with two parts: that Jackson encouraged his stepson to join the military and that he provided emotional encouragement. However, the trial court found that Jackson did not establish that he encouraged his stepson to join the military.

him while he is incarcerated (some weight); (23) Jackson was a good provider to his stepson (some weight); and (24) Jackson was a good provider to his family (some weight).

The second category is that Jackson is a good sibling and son, and he shares the love of his relatives in Georgia. The trial court found eleven mitigating circumstances within this category: (25) Jackson assumed the role of protector and role model to his younger sister (slight weight); (26) Jackson was a good influence on his sister (slight weight); (27) Jackson encouraged his sister through difficulties as she grew up (slight weight); (28) there is mutual love and respect between Jackson and his sister (slight weight); (29) Jackson's sister will maintain a relationship with him while he is incarcerated (slight weight); (30) Jackson is a good son and has been good to his father as an adult (slight weight); (31) Jackson is respectful and polite to his father (slight weight); (32) Jackson has a good relationship with his father (slight weight); (33) Jackson's father will continue to foster their relationship while Jackson is incarcerated (slight weight); (34) Jackson visited his father, family, and friends in Adel, Georgia (slight weight); and (35) Jackson was active in his church[9] (slight weight).

_____

9. This mitigating factor was presented with two parts: that Jackson supported his family to the best of his ability in a very poor town and was active in his church. However, the trial court found that Jackson did not establish that he provided support to his family.

- 16 -

The third category is that Jackson experienced a difficult childhood and upbringing, and the trial court found nine mitigating circumstances within this category: (36) Jackson's mother worked long hours to support the family and, therefore, was not home as he grew up (slight weight); (37) Jackson's mother passed away (slight weight); (38) the passing of Jackson's mother was hard on him (slight weight); (39) Jackson's father was in the U.S. Army and was overseas in some underdeveloped, dangerous areas (slight weight); (40) Jackson's father was not home for long periods of time and could not be with his son (slight weight); (41) Jackson did not have a strong male role model growing up (slight weight); (42) Jackson did not have good adult guidance (slight weight); (43) Jackson was raised by various relatives and lived in a dysfunctional family (slight weight); and (44) Jackson was raised in poverty (slight weight).

The fourth category is that Jackson is a nice, generous, helpful person and friend, and the trial court found six mitigating circumstances within this category: (45) Jackson has a good reputation in Adel, Georgia as a nice and good person (slight weight); (46) Jackson was not known by his friends to be violent (slight weight); (47) Jackson was not a trouble-maker as a child or teenager (slight weight); (48) Jackson was humble, generous, and helped others (some weight); (49) Jackson was a good and trusted friend (slight weight); and (50) Jackson is trustworthy and has a good heart (some weight).

The fifth category is that Jackson is athletic, dependable, and helped children learn sports. The trial court found five mitigating circumstances within this category: (51) Jackson was a good athlete and coached softball for the area children (slight weight); (52) Jackson volunteered his time to children and their families, was a great mentor for youngsters, and taught them about patience (slight weight); (53) Jackson was a nurturing and caring person with children, was very dependable, and was trusted and reliable (slight weight); (54) Jackson was an excellent athlete, dependable, and a good teammate (slight weight); and (55) Jackson was proud of and a good representative of his softball team (slight weight).

The sixth category is that Jackson is a polite, respectful person. The trial court found three mitigating circumstances within this category: (56) Jackson was a gentleman and respectful of women (slight weight); (57) Jackson was not rude to friends or strangers (slight weight); and (58) Jackson was polite, respectful, and had good manners (slight weight).

The seventh category is that Jackson is religious, and the trial court found two mitigating circumstances within this category: (59) Jackson believes in and gave himself to God (some weight); and (60) Jackson and his wife hosted church functions at their home (some weight).

The eighth category is that Jackson is a hard worker. The trial court found two mitigating circumstances within this category: (61) Jackson is a productive and hard worker (some weight); and (62) Jackson grasps artistic concepts easily, perseveres through hard work, and is a good project worker (some weight).

The final categories each contain only one mitigating circumstance: (63) Jackson had a positive outlook on life (slight weight); (64) Jackson's friends and associates will continue to foster a relationship with and visit him while he is incarcerated, which the trial court found to be established as to Jackson's family, but not as to his friends (some weight); (65) Jackson has low-average intelligence (slight weight); and (66) Jackson respects the judicial process and has been polite and cooperative throughout these proceedings (some weight).

In its sentencing order, the trial court addressed the instruction it read to the jury during the penalty phase with respect to whether Jackson played a significant role in Pearce's murder. The trial court recognized that the instruction approved by this Court with respect to Enmund/Tison[10] addresses the defendant's state of mind, which was not included in the instruction read in this case.[11] However, the

10. Tison v. Arizona, 481 U.S. 137 (1987); Enmund v. Florida, 458 U.S. 782 (1982).

11. The language of the instruction approved by this Court provides: "In order for you to recommend a sentence of death in this case you must find [the Defendant] was a major participant in the crime of robbery or burglary and that

- 19 -

trial court noted that Enmund/Tison concern the proportionality of the death penalty for the crime of felony murder where the defendant is only a minor participant in the offense and does not have the requisite mental state that amounts to a reckless indifference to human life. Because Jackson was convicted based on a theory of premeditation—not felony murder—and the jury was never instructed with respect to felony murder, the trial court concluded that Enmund/Tison do not apply.

The trial court weighed the aggravating circumstances against the mitigating circumstances, and noted that the mitigating evidence demonstrated that Jackson had a good home and family life, many friends, did not lack for the necessities in life, did not suffer any abuse or trauma as a child, and did not have any mental health issues. The trial court stated that the image of Jackson as a good friend, father, and husband starkly contrasted with his commission of a brutal and savage murder, as well as the earlier armed robbery. The trial court concluded that the aggravating factors far outweighed the mitigating circumstances and imposed a sentence of death.

This direct appeal followed.

**ANALYSIS**

---

[the Defendant's] state of mind at the time amounted to [reckless] indifference to human life." Perez v. State, 919 So. 2d 347, 366 (Fla. 2005).

- 20 -

## Sufficiency

Jackson's conviction is based on the circumstantial evidence of the sink fingerprint and the hair discovered on Pearce's calf. When the evidence of guilt is wholly circumstantial, it must be inconsistent with any other reasonable hypothesis of innocence. See Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010). Evidence that provides nothing more than a suspicion that the defendant was the perpetrator of the crime is insufficient to sustain the conviction. See Ballard v. State, 923 So. 2d 475, 482 (Fla. 2006) (citing Davis v. State, 90 So. 2d 629, 631-32 (Fla. 1956)). However, the State is not required to rebut all possible hypotheses that could be inferred from the evidence. See Durousseau v. State, 55 So. 3d 543, 557 (Fla. 2010) (citing State v. Law, 559 So. 2d 187, 189 (Fla. 1989)). Instead, it is required to present evidence that is inconsistent with the version of events given by the defendant during trial. Id.; see also Smith v. State, 139 So. 3d 839, 845 (Fla.) ("The relevant inquiry regarding whether the circumstantial evidence of guilt is inconsistent with the defense's theory of innocence is based on the evidence presented and the theory argued to the jury at trial."), cert. denied, 135 S. Ct. 711 (2014). When there is an inconsistency between the evidence presented by the State and the theory of innocence presented by the defendant, the issue is one for the jury and its determination will not be disturbed if supported by competent, substantial evidence. Law, 559 So. 2d at 188.

After the State rested, Jackson moved for a judgment of acquittal on the basis that the circumstantial evidence presented by the State was insufficient to sustain the conviction. Specifically, Jackson contended that the expert testimony did not establish when the fingerprint and hair were left in Pearce's home. The trial court ruled the evidence, when viewed in the light most favorable to the State, negated all reasonable hypotheses of innocence, and denied the motion.

On appeal, Jackson contends that the evidence is insufficient to exclude every reasonable theory of innocence for the following reasons: (1) Jackson had an alibi for the murder, i.e., he was in Georgia to celebrate his birthday; (2) the latent fingerprint found on the sink was not of sufficient value for comparative purposes; (3) the sink fingerprint could have been left prior to the murder; (4) the hair could have been left at Pearce's home on an earlier date and transferred onto the body after the murder; and (5) there is insufficient evidence of premeditation. Alternatively, Jackson asserts that even if he were present during the murder, there is no evidence that he was an active participant in the murder.

The jury was presented with two mutually exclusive theories of what occurred—either Jackson committed the murder, or he was in Adel when the murder occurred. The State introduced competent, substantial evidence that contradicted Jackson's alibi, and, accordingly, the trial court properly denied Jackson's motion for judgment of acquittal. Because of this, it became the role of

the jury to decide the factual issues presented in this case. The jury was free to reject the alibi defense when presented with an alternate and inconsistent version of events by the State. This is especially true because Jackson made inconsistent statements with regard to his relationship with Pearce. See Carpenter v. State, 785 So. 2d 1182, 1195 (Fla. 2001); see also Finney v. State, 660 So. 2d 674, 680 (Fla. 1995). The challenges Jackson raises with respect to the identification and timing of the sink fingerprint, the hair, and his participation in the murder are all issues that were properly presented to and decided by the jury. Because the jury's determination is supported by competent, substantial evidence, it will not be overturned by this Court. Perry v. State, 801 So. 2d 78, 84 (Fla. 2001).

Sink Fingerprint

The latent fingerprint relied on by the State was lifted from the lip of the sink above where Pearce was discovered. Jackson asserts that the evidence was insufficient to establish that the fingerprint belonged to him to the exclusion of all reasonable inferences. However, the State presented the testimony of two fingerprint experts whose qualifications were not questioned or contested during trial. Those experts identified the fingerprint as a match to the right ring finger of Jackson. Thus, the State presented evidence with respect to the identification of the print that was sufficient to withstand a motion for judgment of acquittal and, therefore, this was an issue of fact to be decided by the jury.

With respect to the timing of the fingerprint, the crime scene reconstructionist testified without objection that the sink fingerprint was left while Jackson's finger was coated in Pearce's still-wet blood:

> DEFENSE COUNSEL: Now, with regard to this print, there's not a way to determine—and I'm going to use a phrase—which came first, in a sense, the print was there and the blood came after or the blood was there and the print went through it. There's not a way to determine that, is there?
>
> RECONSTRUCTIONIST: Well, there is with regard to [the] fingerprint at the sink. That was transferred from a hand to the sink so the blood is on the hand and then gets transferred to the sink.

The reconstructionist further testified that the sink fingerprint was a transfer impression that was not left before the attack and could not have been there before the blood.

Counsel alleged for the first time during oral arguments that the reconstructionist was not qualified to state this opinion. Even if, as a crime scene reconstructionist rather than a fingerprint expert, he was not qualified to testify that the fingerprint was a blood transfer print, Pinellas County fingerprint expert Schade also testified that fingerprints that are left in a wet substance are distinctive:

> SCHADE: <u>Now, I should point out that the [photograph of the sink fingerprint] is a print that was left in a wet substance</u>. Now, when I told you before about touching a surface and leaving behind the impression of your fingers, that's assuming that the surface of those ridges are coming in contact and that's what's left behind, is the moisture that's on the surface of the ridges. Even when you get dirt and grease on your hands or paint, if you touch something, most times you'll leave an impression of the ridges. The furrows are not

touching. Only the ridges are. <u>But what happens on a print when the fingers or the palms are covered in a wet surface, heavy perspiration or another foreign substance, when you touch, you're actually squeezing that substrate, you're squeezing the matrix into the furrows, and so the ridges are not the white part, they're the black—I'm sorry. I got that backwards. The ridges are not the black part that was developed, they are the white part, because the substance was pushed into the furrows.</u>

I'm not sure if I'm making sense, but it's a tonal reversal. It's very common when you're dealing with prints left in a foreign substance. . . .

PROSECUTOR: Would that be common on, let's say, a bloody fingerprint?

SCHADE: Yeah, blood is an example of a foreign substance. . . .

(Emphasis supplied.) This testimony supports the conclusion that Jackson's finger

was coated in wet blood before he touched the sink.

Further, the testimony provided by Slebrch also alludes to this theory.

Slebrch testified:

SLEBRCH: What can happen if you get an excess amount of blood or any substance on your hand and then touch a surface with a certain amount of pressure, that will push any of the substance coating your fingers and coating those friction ridges into the spaces in between the ridges or the furrows and that will end up being behind the impression of the furrows.

PROSECUTOR: And is that something you take into account when looking at latent prints like this?

SLEBRCH: Yes.

Thus, Slebrch indicated that the sink print was left while Jackson's finger was

coated in an excess amount of blood.

In contrast, <u>no</u> affirmative evidence was presented in the record that the fingerprint could have been left at an earlier date and was then coated and preserved by Pearce's blood.  The sole comment relied on by Jackson for this proposition did not establish that such a scenario was even possible in this case.  During direct examination, the prosecutor asked Slebrch:

> There's been some discussion in this trial about the possibility that a latent print was left behind on this object, on a sink, and that later blood kind of preserved that print or captured it by going on top of it, similar to the way black powder would be applied to a latent print to preserve and capture that.  Have you ever seen anything like that in your training and experience?

Slebrch responded that she had not.  During cross examination, defense counsel elicited the following responses:

> DEFENSE COUNSEL:  Now, Ms. Slebrch, you—when [the prosecutor] was asking you a moment ago if you had ever seen where blood had been dropped and then a print had gone through it, you stated that you had never seen that before, is that right?
>
> SLEBRCH:  That's correct.  I had never seen that.
>
> DEFENSE COUNSEL:  Does that mean that that could never happen?
>
> SLEBRCH:  <u>No, it's possible that that could occur.</u>

(Emphasis supplied.)  The emphasized portion of this testimony is not evidence that Jackson's theory of events is possible based on the evidence <u>in this case</u>.  Rather, this is simply a statement that such an event may, generally and in some hypothetical set of circumstances, be possible.  Such vague testimony that does not

relate to any actual evidence is not sufficient to prevent the case from being decided by the jury.

Hair Evidence

The DNA expert testified that the hair found on the back of Pearce's calf provided a complete DNA profile of Jackson, and the presence of a complete DNA profile demonstrated that the hair had been forcibly removed. She explained that there are three stages of hair growth: (1) the first stage, in which hair has a fleshy root with DNA cells and is growing and firmly attached to the head; (2) the second stage, during which the root begins to die, the hair no longer actively grows, and only a partial DNA profile may be present; and (3) the third stage, during which hair is no longer attached to the root, may be naturally shed, and is unsuitable for DNA testing. She also testified that normal handling, such as brushing or running a hand through hair, would not be sufficient to forcibly remove hair in the first stage of growth. However, once hair has been removed, it may be transferred from one object to another, and there is no way to determine when the hair was removed.

Jackson's theory of innocence is that the hair was removed prior to the murder, possibly while he moved a couch at Pearce's house, and was transferred onto Pearce by a cat or when she sat on the couch. However, the State presented evidence that a struggle occurred between Pearce and her attacker—i.e., the

defensive wounds and Jackson's forcibly removed hair. Also, the crime scene reconstructionist testified that he found the hair on the back of Pearce's calf, it was not attached in any way to the calf, and that had Pearce stood up, the hair would have fallen off. Because of this, it is not reasonably possible that the hair was transferred onto Pearce's leg prior to the attack. The theory that a cat deposited the hair onto the body after the murder stretches the bounds of reason. Additionally, as discussed below, the combination of the hair with the sink fingerprint provides sufficient evidence to negate all reasonable hypotheses of innocence.

Circumstantial Evidence Cases

The presence of both the hair and the fingerprint distinguishes this case from other circumstantial cases in which only one piece of evidence connected the defendant to the murder scene. For example, in Jaramillo v. State, 417 So. 2d 257, 258 (Fla. 1982), the defendant's fingerprints were lifted from a knife found on a table in the victims' house, a grocery bag found next to a chair, and the packaging for a knife that was found near one of the victims. The victims had been shot to death in their home. Id. at 257. The defendant testified that he knew the nephew of one victim, who lived in the home, and that during a visit to the home a day prior to the murders, he helped organize the garage. Id. at 258. He explained that he needed a knife to cut boxes, and was told to use a knife that was in a bag on the dining room table. Id. Notably, fingerprints that did not match the defendant were

found in the house on the handcuffs that restrained one victim, the knife packaging, and in the bedrooms and closets that had been ransacked.  Id.  This Court noted that the evidence presented by the State did not establish when the defendant's fingerprints were left at the house and was not inconsistent with the defendant's theory that the fingerprints had been left prior to the murder.  Id. at 257. Accordingly, the Court held that the defendant's fingerprints, which were the only evidence offered by the State, did not provide sufficient circumstantial evidence to support the convictions.  Id.

Similarly, in Shores v. State, 756 So. 2d 114, 115 (Fla. 4th DCA 2000), the Fourth District Court of Appeal reversed a burglary conviction where the only evidence that implicated the defendant was the presence of his fingerprint on a box of ammunition in a drawer that was ransacked.  The district court noted that there was no evidence with regard to when the fingerprint had been left on the box, and when identity in a circumstantial case is established exclusively by fingerprint evidence, there must be evidence that the print could have been left only at the time the crime was committed.  Id. (citing C.E. v. State, 665 So. 2d 1097, 1098 (Fla. 4th DCA 1996)).  Moreover, the district court noted that when a fingerprint is found on an item that was accessible to the public, the evidence is insufficient to sustain a conviction.  Id. at 116.  The defendant in Shores alleged that his fingerprint could have been on the ammunition box before the victim purchased it,

and there was no evidence that refuted this hypothesis.  Id.  The court determined that this scenario was comparable to other Florida cases in which the evidence was held to be insufficient, including one case in which the defendant's fingerprints were found on a candy bar wrapper purchased by the victim from the same store where the defendant shopped, Leonard v. State, 731 So. 2d 712 (Fla. 2d DCA 1999), and another case in which the defendant's fingerprints were found on a gumball machine in a store, Mutcherson v. State, 696 So. 2d 420 (Fla. 2d DCA 1997).

Instead, this case is more comparable to Darling v. State, 808 So. 2d 145, 157 (Fla. 2002), in which the circumstantial evidence included not only a fingerprint, but also DNA evidence in the form of semen.  In Darling, the defendant asserted that he had consensual sex with the victim, and she was then killed by another person.  Id. at 156.  However, the evidence of sexual assault combined with the lack of any evidence that the defendant had a relationship with the victim was inconsistent with this theory.  Id.  Additionally, this Court rejected the defendant's contention that the presence of his fingerprint on a lotion bottle in the victim's bathroom was not compelling and insufficient to establish guilt pursuant to Jaramillo and Shores.  Id. at 157.  The Court concluded that the fingerprint combined with the evidence of rape and DNA evidence distinguished

the case from those in which fingerprint evidence, standing alone, was held to be insufficient. Id.

Similarly, the evidence here includes the blood transfer fingerprint as well as Jackson's forcibly removed hair. The presence of both pieces of evidence that are unique to Jackson distinguishes this case from circumstantial cases that are based on a sole piece of evidence. Further, the evidence is inconsistent with the theory that Jackson was in Adel at the time of the murder and supports the conclusion that Jackson was inside Pearce's home and struggled with her at the time of the murder.

Moreover, the cases relied on by Jackson are distinguishable. In Ballard, over one hundred fingerprints were lifted from the crime scene, four of which were from the bedframe near where one of the two victims was found. Ballard, 923 So. 2d at 479. One of the prints on the bedframe belonged to the defendant. Id. Additionally, six hairs were found in the hand of one of the victims, three of which belonged to the victim, two that were too short to provide sufficient information, and one that belonged to the defendant. Id. at 479-80. This hair was in the third phase of growth, and there was no cellular tissue on it, so the expert could not determine whether the hair was forcibly removed or naturally shed. Id. at 480. Additionally, five unidentified forcibly removed hairs were also discovered in the house, and hundreds of hairs in total were recovered. Id.

Other evidence suggested that the defendant may not have been the killer. A week prior to the murders, a person affiliated with a street gang shot at the house, and the State presented no evidence that definitively ruled out the gang members as the perpetrators. Id. at 485. One victim was known to sell marijuana and hide cash within the home. Id. at 477. Additionally, the vehicle that belonged to one victim was found in the woods approximately one mile from the defendant's residence with blood and fingerprints in it, but neither the blood nor the fingerprints belonged to the defendant. Id. Finally, bloody fingerprints that did not match those of the defendant were found on a barbell and a curl bar located in the room where the second victim was found. Id. at 479. This Court held that the circumstantial evidence in Ballard was not sufficient to support the conviction. Id. at 483. The defendant had been a regular visitor at the home, and the Court concluded that the hair and fingerprint evidence could have been left during one of his many visits. Id. Accordingly, the evidence was not inconsistent with his reasonable hypothesis of innocence. Id. at 485-86.

Jackson contends that this case is comparable to Ballard. Like in Ballard, there was other hair and fingerprint evidence. A total of five hairs were found in Pearce's home, three of which were not suitable for DNA testing, one that matched Pearce, and one that matched Jackson. A palm print was lifted from a doorjamb inside the house that remained unidentified, but Jackson was excluded as a person

who could have left the print.  Other latent prints were also found in the house.[12] Additionally, items had been stolen from the home by three individuals who were seen leaving from the back of the house before Pearce was discovered.  Finally, the DNA on the second knife, and the sock and footwear impressions, suggested that more than one person could have been involved in the murder.

However, despite these similarities, significant distinctions render Ballard inapplicable.  For example, the hair found in this case had been forcibly removed, whereas the hair in Ballard could have been naturally shed.  Additionally, unlike in Ballard, there were no hairs other than the defendant's found on Pearce.  With respect to the print evidence, the sink fingerprint was left in wet blood, and placed Jackson above or near the body during the murder.  In Ballard, there was no evidence as to when the defendant's fingerprint was left on the bed.  923 So. 2d at 484.  Moreover, in Ballard many fingerprints remained unidentified.  Id. at 479. Here, the only print that remained unidentified was the palm print left on a doorjamb.

With respect to the evidence of other crimes (here, the stolen property; in Ballard, the drive-by shooting), there is no evidence that any violent crimes had been directed towards Pearce around the time of the murder.  Further, the lead

---

12.  There is no testimony with respect to how many prints were lifted from the home.  However, Royal testified that she received twelve latent lift cards.

detective testified that he identified the individuals who entered the home, and he spoke with two of them, who admitted that they took a television. However, no forensic evidence linked these individuals to the house.

This Court's opinion in Cox v. State, 555 So. 2d 352 (Fla. 1989), also relied on by Jackson, is equally inapplicable. In Cox, the evidence against the defendant included that: (1) O-type blood, the same type as the defendant's, was found in the car of the victim; (2) the tongue of the defendant had been bitten off and appeared to have been bitten by a person other than the defendant; (3) a hair that was consistent with that of the defendant was found in the vehicle of the victim; and (4) a print that appeared to be made by a military-type boot was found in the victim's vehicle, and the defendant was in the military at the time of the crime, but no comparison was performed on the print found in the vehicle and the defendant's boots. Id. at 353. This Court held the circumstantial evidence to be insufficient. Id. However, the evidence here is more compelling. The hair found on Pearce was tested for DNA and matched Jackson, thus placing him in Pearce's house. The blood transfer print demonstrates that he was in the house during the murder. In contrast, nothing in Cox conclusively linked the defendant to the victim. Id.

The third case relied on by Jackson, Lindsey v. State, 14 So. 3d 211 (Fla. 2009), is even less comparable. In Lindsey, the Court summarized the circumstantial evidence as follows:

> (1) a Crown Royal bag containing jewelry was taken during the robbery of Big Dollar pawn shop; (2) [the defendant's ex-wife] found a Crown Royal bag containing jewelry in a closet of an apartment where she sometimes stayed with [the defendant] and several other individuals, including [another individual who had been convicted for the second-degree murder of the victim and the robbery of the pawn shop]; (2) [the defendant] eventually sold the jewelry from the bag in the closet at a flea market; [and] (3) [the defendant told another inmate] that [the inmate] should always kill witnesses to crimes and that [the defendant] had to do that.

Id. at 215-16. In addition, a fingerprint that matched the defendant was found on a pawn shop slip dated several weeks before the murder. Id. at 214. The Court held this evidence insufficient to establish that the defendant was in the pawn shop at the time of the murder. Id. at 216. As previously discussed, the evidence here places Jackson in Pearce's house during the murder.

Active Participant

Jackson alleges for the first time on appeal that the evidence is insufficient to establish that he was an active participant in the murder. Jackson relies on the evidence that more than one person may have been in the home to assert that he may merely have been present during the killing. However, where a conviction is based on circumstantial evidence, the State is not required to contradict every possible version of events. See Smith, 139 So. 3d at 845. Rather, the State is required to present evidence that contradicts the theory of innocence presented by the defendant during trial. Id. Further, this claim is not preserved because it was not asserted before the jury.

Moreover, even if this claim had been preserved, it is without merit.  The evidence presented during trial establishes that Jackson was at the sink above where Pearce's body was found with her wet blood on his hand.  The forcibly removed hair suggests that Pearce engaged in a struggle with Jackson prior to her death.  Moreover, the jury heard evidence that more than one person may have been present, was given a principal instruction, and convicted Jackson of first-degree murder.  The jury was additionally given a special interrogatory during the penalty phase that asked whether Jackson played a significant role in the homicide of Pearce.  Again, the jury found that he did.  Thus, although the parties did not assert before the jury that more than one person was present during the murder, the jury found that Jackson was an active participant, and its decision is supported by competent, substantial evidence.

Premeditation

Whether premeditation exists is a question of fact for the jury, as is whether the State has presented evidence to exclude all reasonable hypotheses of innocence.  Premeditation is a fully formed and conscious purpose to kill, and can be formed up to even only a moment before a killing occurs, but must exist for a sufficient time to permit reflection as to the nature and probable result of the act.  Green v. State, 715 So. 2d 940, 943-44 (Fla. 1998) (citing Coolen v. State, 696 So. 2d 738, 741 (Fla. 1997)).  When a victim is deliberately stabbed with a knife

several times in vital organs, as occurred here, the manner of death can provide circumstantial evidence of premeditation. See Perry, 801 So. 2d at 85-86. The wounds here are similar to those in cases where this Court determined premeditation was established.

In Perry, the victim was stabbed four times in the chest and three times in the neck, and also suffered a defensive wound to the thumb. Id. at 81. Four of these wounds would have been fatal individually. Id. at 86. One stab wound penetrated the chest bone of the victim, which required extensive force and demonstrated the injury was carefully inflicted in a deliberate manner so as to effectuate death. Id. Similarly, in Morrison v. State, 818 So. 2d 432, 452 (Fla. 2002), the victim suffered two major knife wounds to the neck, and the second blow was sufficiently deep to nick the victim's vertebrae. This Court concluded that the use of a knife to stab the victim in this manner was sufficient evidence to support the jury's conclusion that the murder was premeditated. Id.

Here, the State presented as circumstantial evidence of premeditation the multiple and violent stab wounds inflicted with a knife, many of which were to Pearce's head. Additionally, the stab wounds to the neck and chest were both fatal. Because the knife was left in Pearce's chest, it is likely that the neck wound was inflicted first. Thus, even after Jackson had fatally wounded Pearce in the neck, he stabbed her again in the chest and with such force that the five-inch knife

penetrated approximately eight inches into Pearce's body and broke off a piece of her scapula. Accordingly, the nature, number, and manner of these wounds provides competent, substantial evidence to support the jury finding of premeditated murder.

This case is distinguishable from Green, 715 So. 2d at 940; Coolen, 696 So. 2d at 738; and Kirkland v. State, 684 So. 2d 732 (Fla. 1996), relied on by Jackson. In each case, the State relied exclusively on the nature and number of stab wounds to establish premeditation, and this Court held the circumstantial evidence to be insufficient. In both Green and Coolen, the evidence reasonably supported a scenario in which the killings resulted from an escalated fight. 715 So. 2d at 944; 696 So. 2d at 742. Here, because Jackson relied exclusively on an alibi defense, the only possible conclusions from the evidence presented during trial were that Jackson was not present, or he committed a premeditated killing. With respect to Kirkland, the nature and number of wounds is not comparable to those inflicted on Pearce. Additionally, the Court in Kirkland noted that the defendant had an IQ in the sixties. 684 So. 2d at 735.[13] Jackson has an IQ within a ten-point range of eighty-four. Accordingly, this case is closer to Perry and Morrison than to Green, Coolen, or Kirkland.

_____

13. Kirkland was decided prior to Atkins v. Virginia, 536 U.S. 304 (2002) (holding unconstitutional the execution of individuals with intellectual disabilities).

Based on the foregoing, we deny Jackson's claims with respect to the sufficiency of the evidence.

Closing Statements

During trial, Schade testified with respect to changes in the testimony given by fingerprint experts over the last ten to twenty years. For example, the prosecutor asked Schade to explain how laboratories have changed over the years, and Schade responded:

> Well, we've always talked about the science of fingerprints, however, we did not always adhere to some of the other principles of science that are now coming to the forefront. Science is never absolute, one hundred percent certain. Science always leaves the door open for additional information, additional examination, and even changing conclusions. Early on, and as recently as 15 years ago, fingerprint people were trained you examine the evidence carefully, you come to a conclusion and you stand by it, come hell or high water. It was weakness to say, well, I'm reconsidering my opinion. And that's a big change for us. It's still is very difficult sometimes to think that, you know, we can no longer say we're one hundred percent certain, this is a one hundred percent match.
>
> Those terms are no longer allowed in court and that's really holding to the [tenets] of science. It's just the way it is. It's a preponderance of evidence, it's a conclusion that, you know, it can be possible or plausible conclusions but science never says one hundred percent. That's a big change for us to go from the days of it's my opinion, I'm a hundred percent and I will not be swayed to reconsidering.

In addition, when the State cross-examined Royal, the following exchange occurred:

> PROSECUTOR: Okay. Now, would you agree with the concept that if an identification is made, for example, when you come into court

and you say that matches that person, that that's a hundred percent accurate?

ROYAL:  That is correct.

PROSECUTOR:  Okay.  Is there any doubt in your mind whatsoever when you make those decisions?

ROYAL:  No, the identification is made then I'm a hundred percent certain that the unknown print was identified to a set of known prints.

PROSECUTOR:  And that's the way you've been taught to operate?

ROYAL:  That is how I operate.

During closing statements, the prosecutor made the following remark:

> Now, Michelle [Royal] is a good woman.  I've put her on the stand before in many cases to convict defendants of crimes.  She's just wrong on this one.  It happens.  It was interesting, the reason I asked her this question about the hundred percent and the reason why Bill Schade spent all that time talking about the change is Michelle Royal is old school.  She was taught you walk into court, it's a hundred percent, no doubt, this is the way I am.  She's also taught that once a lab makes a decision, that decision is final.  She runs that lab, she made the call that wasn't a print of value and she's going to stand by that conclusion because that's what she does in court.  A hundred percent.
>     Bill Schade told you that's really not where the business—not where the expertise is going.  You saw a lot of that from the FBI.  Jacqueline Slebrch.  She's the new school.  She's been taught new.  That's why they're doing the whole blind verifications.  That's why they're doing those things.  Regardless, he admits it's his print.

No objection was made to this remark, and as such, we review it for fundamental error.  Braddy v. State, 111 So. 3d 810, 837 (Fla. 2012), cert. denied, 134 S. Ct. 275 (2013).  An error is not fundamental unless it reaches down into the validity of

the trial itself to the extent that the guilty verdict could not have been obtained in the absence of the error.  Id.

To the extent that the prosecutor's closing statement compared "old school" and "new school" methodology, these remarks were related to testimony that was presented to the jury.  Where the jury is to decide a matter based on the testimony of competing experts, it is the job of the attorney to highlight how the testimony of the expert presented by the opposing party differs from that of his or her own expert and explain why the opposing expert's opinion is flawed.  Counsel must attempt to persuade the jury why it should credit one expert over another by attacking the opposing expert's credentials and distinguishing the methods and procedures used by each expert.

However, it is impermissible to vouch for the credibility of a witness, see Williamson v. State, 994 So. 2d 1000, 1013 (Fla. 2008), assert personal knowledge, see Murphy v. International Robotic Systems, Inc., 766 So. 2d 1010, 1028 (Fla. 2000), or comment on facts outside the evidence presented during trial, see Bigham v. State, 995 So. 2d 207, 214 (Fla. 2008).  To the extent that the prosecutor vouched for or asserted personal belief as to the credibility of Royal, asserted personal knowledge of how she operates, commented on matters outside the evidence presented during trial, or bolstered the testimony of Slebrch, we conclude that any error was not fundamental.

During trial, the State presented two qualified latent print experts who identified the sink fingerprint. Slebrch testified that after she received her bachelor's degree in chemistry, she then completed an approximately eighteen-month training program with the latent print unit at the FBI. This training included written and oral exams, moot courts, oral boards, comparison and processing exams, and a comprehensive qualifications exam. To maintain her qualifications, she is required to complete an annual comparison test. She explained that the FBI uses standard operating procedures to ensure the latent print analysts report accurate results. One of these procedures is the use of blind verification in which another qualified examiner who has no knowledge of the case or the conclusion of the original examiner conducts an independent analysis, comparison, and evaluation of the latent print. With respect to Schade, he worked as a latent print expert for over forty years. He received training from both the Nassau County Police Department in New York and the FBI Academy in Quantico. He is a member of the International Association for Identification and has been certified by that organization as a fingerprint examiner since 1978. Accordingly, two qualified experts presented testimony in which they concluded that the sink fingerprint belonged to Jackson, and there is no reasonable possibility that the comment by the prosecutor about the fingerprint experts is such that the guilty

verdict could not have been reached without it. See Gonzalez v. State, 136 So. 3d

1125, 1140 (Fla.), cert. denied, 135 S. Ct. 193 (2014).

## HAC

Jackson asserts that the HAC aggravating circumstance was impermissibly

vicariously applied to him. The trial court addressed in its sentencing order

whether HAC may be applied to Jackson in light of the request by the State that a

principal instruction be given. The trial court found the following:

> In this case, the Court has no trouble finding that the Defendant
> was "particularly physically involved" in the murder of Debra Pearce.
> The Defendant testified that he wasn't present when the crime
> occurred. Clearly the jury rejected the Defendant's claim of alibi
> when it found him guilty of Premeditated First Degree Murder. With
> the jury's rejection of the Defendant's alibi claims, and no testimony
> from the Defendant, or anyone else, that specifically identified anyone
> other than the Defendant who could have done the actual killing, the
> overwhelming conclusion to reach is that the Defendant directly
> caused the victim's death.
>       However, even if there was an unknown assailant that did the
> actual killing, the forensic evidence linking the Defendant to the crime
> scene supports the determination that the Defendant was "particularly
> physically involved" in killing Debra Pearce. The Defendant's
> fingerprint left in the victim's blood next to the kitchen sink not only
> identified the Defendant as a suspect, but also indicated that he was
> present while the victim's blood was still fresh and had not dried up.
> The imprint was, therefore, made close to the time that the victim
> struggled with her attacker. Also, a hair expert testified during the
> guilt phase that the hair found on the victim's calf matching the
> Defendant's DNA profile was a pulled hair containing the root, not
> one that was cut or clipped with a sharp instrument. As such, this
> evidence was consistent with a finding that the Defendant engaged in
> some type of struggle with the victim, again, at or near the time of her
> death.

Additionally, the jury unanimously found beyond a reasonable doubt via a penalty phase special interrogatory that Jackson played a significant role in the homicide of Pearce. Where an aggravating circumstance is supported by competent, substantial evidence, it will not be overturned on appeal. See, e.g., Guardado v. State, 965 So. 2d 108, 115 (Fla. 2007).

As previously discussed, we conclude that the evidence is sufficient to support the jury conviction for first-degree, premeditated murder to the exclusion of all reasonable theories of innocence that were presented during trial. The evidence presented during trial establishes that: (1) Jackson had the wet blood of Pearce on his hand and touched the sink above where Pearce was found; (2) a hair that had been forcibly removed from Jackson was found on Pearce such that it would have fallen off had she stood up; (3) Pearce suffered defensive wounds; and (4) Jackson lied and denied knowing Pearce or ever having been to her house until confronted with the evidence against him. This evidence supports the jury determination that Jackson struggled with Pearce and ultimately stabbed her to death. Accordingly, the HAC aggravating circumstance was not applied vicariously in this case, and this claim is without merit.

Moreover, this case is not comparable to Perez v. State, 919 So. 2d 347 (Fla. 2005), relied on by Jackson. In Perez, the evidence conclusively established that two identified individuals were present during the murder. Id. at 356. The

defendant admitted that he and two other individuals went to the victim's house to steal her car.  Id. at 355.  He also admitted that he witnessed his codefendant stab the victim, and he then ran through the house behind the codefendant, who stole various items.  Id. at 356.  However, the defendant consistently asserted that his codefendant committed the murder of his own accord and without prior discussion.  Id. at 381.  Because there was no evidence that the defendant directed the murder, knew that the victim would be killed, or knew how the victim would be killed, this Court struck the HAC aggravator as applied to him.  Id.  Notably, in Perez, this Court expressed concern that the trial court did not address the line of cases that requires a showing that the defendant directed or knew that the victim would be killed and how the victim would be killed where HAC is applied vicariously.  Id.

Here, the evidence was merely ambiguous as to whether more than one person was present during the murder.  Although a second knife was found under Pearce with DNA on it that did not match either Jackson or Pearce, there is no evidence that this knife was used during the attack.  Further, in contrast to the defendant in Perez, Jackson never asserted until this appeal that he was present and simply not active in the murder.  Accordingly, this case is not comparable to Perez.

Additionally, even though Jackson does not appear to dispute that HAC applies to the murder, we note that competent, substantial evidence supports this aggravating circumstance, which has been consistently upheld in cases where the

victim was repeatedly stabbed. See, e.g., Francis v. State, 808 So. 2d 110, 134 (Fla. 2001). Here, Pearce suffered defensive wounds to her arms and several lacerations or abrasions to her head and face. Her shirt had been twisted around her body and displaced. The medical examiner testified that he could not be certain whether Pearce was conscious throughout the attack but, because she bled to death, it is possible. He additionally testified that she was not immediately stabbed in a major organ, "so it would take sometime [sic], especially if the jugular was the first one and then the scap—the chest one is later." Thus, the evidence indicates that Pearce, who was at home and in her kitchen, struggled against an attacker armed with a knife during a vicious attack and attempted, unsuccessfully, to ward off numerous blows aimed at her face, neck, and chest. Accordingly, competent, substantial evidence supports this aggravating factor with regard to the murder itself.

Proportionality

Jackson asserts that the death penalty cannot be imposed because it violates the requirement of individualized punishment delineated by Enmund and Tison. However, Enmund and Tison do not apply to this case, which was prosecuted exclusively on the basis of premeditated first-degree murder. No felony murder instruction was read to the jury. In Jackson v. State, 575 So. 2d 181, 190-91 (Fla. 1991), this Court explained the holdings of Enmund and Tison:

- 46 -

In Enmund and Tison, the Court said that the death penalty is disproportional punishment <u>for the crime of felony murder</u> where the defendant was merely a minor participant in the crime and the state's evidence of mental state did not prove beyond a reasonable doubt that the defendant actually killed, intended to kill, or attempted to kill. Mere participation in a robbery that resulted in murder is not enough culpability to warrant the death penalty, even if the defendant anticipated that lethal force might be used . . . .

(Emphasis supplied.) Accordingly, the <u>Enmund</u>/<u>Tison</u> claim raised by Jackson is without merit.

Jackson also asserts that the death sentence is disproportionate. In each case that imposes the death penalty, the Court performs a comprehensive analysis to determine whether the crime is among the most aggravated and least mitigated. See <u>Taylor v. State</u>, 937 So. 2d 590, 601 (Fla. 2006). The Court considers the totality of the circumstances and compares the case with other capital cases so as to ensure uniform application of the death sentence. <u>Id.</u>

Here, the three aggravating factors of prior violent felony conviction (based on two convictions), murder committed while on felony probation, and HAC were each given great weight. These aggravating factors were weighed against sixty-six mitigating circumstances, many of which were substantially similar and related to Jackson's positive attributes as a father, husband, friend, and worker. Of the sixty-six mitigating circumstances, the trial court found that thirty-six warranted only slight weight, twenty-three warranted some weight, and only seven warranted

moderate weight.  The trial court did not give any mitigating circumstance great weight.

Proportionality is not a comparison of the number of circumstances, but instead is a qualitative review of the totality of the circumstances and the underlying basis that supports the application of each circumstance.  See Simpson v. State, 3 So. 3d 1135, 1148 (Fla. 2009).  This Court has previously held the death sentence to be proportionate despite the finding of a large number of mitigating circumstances.  See Abdool v. State, 53 So. 3d 208, 215, 228 (Fla. 2010) (holding death sentence proportionate where cold, calculated, and premeditated and HAC were weighed against four statutory mitigating factors and forty-eight nonstatutory mitigating factors); see also Willacy v. State, 696 So. 2d 693, 695 n.2, 696 (Fla. 1997) (holding death sentence proportionate where five aggravating circumstances were weighed against thirty-one nonstatutory mitigating factors, most of which were cumulative and general in nature).  Here, although the trial court found a large number of mitigating factors, they are repetitive and involve positive aspects of Jackson's life, whereas the three aggravating factors demonstrate an individual who repeatedly commits violent criminal acts.  Accordingly, we conclude that the underlying bases for the aggravating circumstances in this case are weightier than those that support the mitigating circumstances.

Moreover, prior violent felony and HAC are among the weightiest aggravating circumstances. See Gonzalez, 136 So. 3d at 1167. Jackson does not challenge the weight applied to the aggravating factors, but to support his assertion that the death penalty is disproportionate, he contends that the prior violent felony and felony probation factors are relatively weak. Jackson asserts that because one felony conviction was used to support both the prior violent felony and felony probation aggravating circumstances, neither is compelling. However, the trial court considered two convictions when it weighed the prior violent felony aggravating circumstance. One conviction was for an armed robbery that occurred only months after the murder of Pearce. Additionally, although no shots were fired during either felony, the trial court specifically noted that:

> the videotape of the . . . robbery shows an individual who, with all deliberate intent and absolutely no hesitation, walked into the lobby of a hotel, immediately pointed a handgun at an innocent victim, and demanded money. [The victim of the aggravated assault], likewise, provided the description of an individual involved in a narcotics transaction that was willing to brandish a handgun despite the risks presented by such an act.

The court further concluded that the felony probation aggravating circumstance warranted enhanced weight because Jackson was on probation for a violent crime when he committed the murder.

The Court has held the death penalty to be proportionate in cases that involve similar aggravating and mitigating circumstances to those here. In Duest

v. State, 855 So. 2d 33, 45, 47 (Fla. 2003), the death sentence was affirmed where the victim was stabbed twelve times, and three aggravating circumstances—prior violent felony (on the basis of two convictions), murder committed during a robbery or for pecuniary gain, and HAC—were weighed against twelve non-statutory mitigating circumstances. Of the mitigating circumstances, two warranted great weight—that the defendant had a physically and emotionally abusive childhood, and that he experienced childhood traumatization and deprivation of love. Id. at 38 n.3. Similarly, in Singleton v. State, 783 So. 2d 970, 972-73, 979-80 (Fla. 2001), this Court held the death sentence to be proportionate where the victim had been stabbed seven times and the two aggravating circumstances of prior violent felony and HAC were weighed against three statutory mitigating circumstances (the defendant suffered from an extreme mental or emotional disturbance at the time of the murder, the defendant's capacity to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired, and the defendant was sixty-nine at the time of the murder), and nine nonstatutory mitigating circumstances.

The cases relied on by Jackson are not comparable. In Larkins v. State, 739 So. 2d 90, 92 (Fla. 1999), the aggravating factors of prior violent felony and pecuniary gain were weighed against two statutory mitigating factors and eleven nonstatutory mitigating factors. The Court noted that the most serious aggravator

(prior violent felony) was based on two convictions that occurred almost twenty years before the murder, and the defendant had led a comparatively crime-free life in the interim. Id. at 95. The Court specifically noted that HAC was not present in that case. Id. With respect to mitigation, the defendant in Larkins presented evidence of an extensive history of mental and emotional problems and brain damage. Id. at 94.

In contrast, HAC was found in this case. Additionally, Jackson had no mental health or emotional mitigation, and the forensic psychologist testified that there was nothing clinically significant in Jackson's psychological profile. Further, Jackson did not lead a relatively crime-free life and had violent felony convictions for acts both before and after the murder. When the trial court weighed the aggravating and mitigating circumstances, it specifically noted: "From the evidence, the Defendant has consistently led an entirely separate life from the one known to his family and friends that involved a repeated willingness to resort to violent criminal acts to further his intentions."

In Johnson v. State, 720 So. 2d 232, 235 (Fla. 1998), the aggravating circumstances of prior violent felony (based on four convictions) and murder committed during a burglary merged with pecuniary gain were weighed against the statutory mitigating circumstance of young age and six nonstatutory mitigating circumstances. This Court noted that although the prior violent felony aggravating

circumstance was properly found, it was not strong when considered in light of the facts of the case because it was based in part on the aggravated assault committed by the defendant on his brother, who testified that he was not injured, and the incident was a misunderstanding. Id. at 238. Two of the other felonies were based on contemporaneous convictions as a principal to crimes simultaneously committed by a codefendant. Id. For these reasons, the Court vacated the death sentence. Id. In contrast, neither of the felonies that formed the basis for the prior violent felony aggravating circumstance here was committed during the murder. Additionally, the weighty circumstance of HAC was found.

The other cases relied on by Jackson are equally uncompelling. See Robertson v. State, 699 So. 2d 1343, 1347 (Fla. 1997) (death penalty vacated where the murder was "an unplanned, senseless murder committed by a nineteen-year-old, with a long history of mental illness, who was under the influence of alcohol and drugs at the time"); Terry v. State, 668 So. 2d 954, 965 (Fla. 1996) (holding death sentence disproportionate where the murder was the result of a robbery gone bad, and the aggravating circumstances of prior violent felony and murder committed during the course of an armed robbery/pecuniary gain were not compelling given the underlying facts); Wilson v. State, 493 So. 2d 1019, 1023 (Fla. 1986) (holding death sentence disproportionate where "the murder . . . was

the result of a heated, domestic confrontation and the killing, although premeditated, was most likely upon reflection of a short duration").

Accordingly, we hold the death sentence to be proportionate in this case.

Ring

Jackson asks that we revisit prior decisions that hold that Florida's death penalty statute does not violate the Sixth Amendment under the principles announced in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000). We decline to revisit the numerous decisions that hold that Florida's capital sentencing scheme does not violate the United States Constitution under Ring or Apprendi. See, e.g., Abdool, 53 So. 3d at 228 ("This Court has also rejected [the] argument that this Court should revisit its opinions in Bottoson v. Moore, 833 So. 2d 693 (Fla. 2002), and King v. Moore, 831 So. 2d 143 (Fla. 2002)."); see also Duest, 855 So. 2d at 49. Moreover, this Court has repeatedly held that Ring does not apply where the trial court found the aggravating factors of prior violent felony and felony probation, both of which are present in this case. See, e.g., Hampton v. State, 103 So. 3d 98, 116 (Fla. 2012); Hodges v. State, 55 So. 3d 515, 540 (Fla. 2010).

**CONCLUSION**

Based on the foregoing, we affirm Jackson's conviction and sentence of death.

It is so ordered.

LABARGA, C.J., and LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.
PARIENTE, J., concurs in result.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Duval County,
    James Hunt Daniel, Judge - Case No. 162008CF010726AXXXMA

Nancy Ann Daniels, Public Defender, and Nada Margaret Carey, Assistant Public Defender, Second Judicial Circuit, Bartow, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, and Patrick M. Delaney, Assistant Attorney General, Tallahassee, Florida,

    for Appellee